[No. S112443. Apr. 5, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD WAYNE TAYLOR, Defendant and Appellant.

Counsel

Joseph Shipp, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Michael E. Banister, Eric D. Share, Catherine A. McBrien, Catherine A. Rivlin and Ross C. Moody, Deputy Attorneys General, for Plaintiff and Respondent.

---

Opinion

**BROWN, J.**—A defendant shoots a woman, killing her. As a result, her fetus also dies. In the absence of evidence the defendant knew the woman was pregnant, may the defendant be held liable for the second degree implied malice murder of the fetus? We conclude he may, and therefore reverse the judgment of the Court of Appeal.

I. Facts and Procedural Background

The following facts are taken largely from the Court of Appeal opinion. Defendant Harold Wayne Taylor and the victim, Ms. Patty Fansler, met in the spring of 1997. They dated and then lived together along with Fansler's three children. In July 1998 Fansler moved out. Defendant was heard threatening to kill Fansler and anyone close to her if she left him. Defendant wanted to "get back" with Fansler, and told one of her friends he could not handle the breakup, and if he could not have her, "nobody else could."

Defendant and Fansler spent New Year's Eve 1998 together. On January 1, 1999, a police officer responded to a call regarding a woman screaming in a

motel room. In the room he found defendant and Fansler. Fansler was "upset and crying," and said defendant had raped her. Defendant was arrested, and shortly thereafter Fansler obtained a restraining order against him.

After the first of the year, Fansler asked her employer to alter her shifts so defendant would not know when she was working. In January 1999, defendant followed Fansler and her ex-husband in a car at high speeds for a mile or so, and on two other occasions tailgated her.

On March 9, 1999, defendant entered Fansler's apartment through a ruse, and after an apparent struggle, shot and killed Fansler. Fansler's son Robert, who heard his mother's muffled screams, but was unable to enter the apartment, pounded on Fansler's window outside the bedroom in which she was being attacked, and yelled "Goddamn it, you better not hurt her." Defendant was seen leaving the apartment, and Robert and a friend, John Benback, Jr., chased but did not catch him.

Back in the apartment Fansler was found by her boyfriend John Benback, his son, John, Jr., and Robert. John Benback, Sr., testified, "She was lying on her back on the bed. The room had been pretty well trashed. There was blood everywhere."

Fansler died of a single gunshot wound to the head. (A subsequent search of the room revealed a second bullet had penetrated and exited the nightstand, and a fragment of this bullet was found near the nightstand.) Fansler also suffered a laceration on the back of her head that penetrated to her skull and chipped the bone, and bruising on her neck, legs, and elbows.

The autopsy revealed that Fansler was pregnant. The fetus was a male between 11 and 13 weeks old who died as a result of his mother's death. The examining pathologist could not discern that Fansler, who weighed approximately 200 pounds, was pregnant just by observing her on the examination table.

The prosecution proceeded on a theory of second degree implied malice murder as to the fetus.[1] The jury convicted defendant of two counts of second

---

[1] The jury was instructed that in order to prove the crime of second degree murder as to the fetus, "each of the following elements must be proved: A human fetus was killed; the killing was unlawful; and the killing was done with malice aforethought." It was also instructed that "Malice is implied when, one, the killing results from an intentional act; two, the natural consequences of the act are dangerous to human life; and three, the act was deliberately performed with knowledge of the danger to and conscious disregard for human life." "When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in death of a human being or human fetus."

degree murder, and found true attendant firearm enhancements. (Pen. Code, § 187, subd. (a).)[2] He was sentenced to 65-years-to-life in prison.

The Court of Appeal reversed defendant's second degree murder conviction based on the fetus's death. The court concluded there was evidence to support the physical, but not the mental, component of implied malice murder. "There is not an iota of evidence that [defendant] knew his conduct endangered fetal life and acted with disregard of that fetal life. It is undisputed that the fetus was [11] to 13 weeks old; the pregnancy was not yet visible and [defendant] did not know Ms. Fansler was pregnant." In contrast to "the classic example of indiscriminate shooting/implied malice" of a person firing a bullet through a window not knowing or caring if anyone is behind it, "[t]he undetectable early pregnancy [here] was too latent and remote a risk factor to bear on [defendant's] liability or the gravity of his offense." "[T]he risk to unknown fetal life is latent and indeterminate, something the average person would not be aware of or consciously disregard." "[W]ere we to adopt the People's position, we would dispense with the subjective mental component of implied malice. Where is the evidence that [defendant] acted with knowledge of the danger to, and conscious disregard for, fetal life? There is none. This is dispositive."

We granted the Attorney General's petition for review.

## II. DISCUSSION

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (*People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*); § 187, subd. (a).) "[V]iability is not an element of fetal homicide under section 187, subdivision (a)," but the state must demonstrate "that the fetus has progressed beyond the embryonic stage of seven to eight weeks." (*People v. Davis* (1994) 7 Cal.4th 797, 814–815 [30 Cal.Rptr.2d 50, 872 P.2d 591].)

"Malice may be either express or implied. It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.'[3] (§ 188.) It is implied . . . 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]. For convenience, we shall refer to this mental state as 'conscious disregard for life.'" (*People v. Lasko* (2000) 23 Cal.4th 101, 107

---

[2] All further statutory references are to the Penal Code.

[3] The issue of express malice and transferred intent is not before us in this case. (See generally *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*).)

[96 Cal.Rptr.2d 441, 999 P.2d 666].) "[I]mplied malice has both a physical and a mental component, the physical component being the performance ' "of an act, the natural consequences of which are dangerous to life," ' and the mental component being the requirement that the defendant ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*Hansen, supra,* 9 Cal.4th at p. 308.)

■ "It is plain that *implied* malice aforethought does not exist in the perpetrator only in relation to an intended victim. Recklessness need not be cognizant of the identity of a victim or even of his existence." (*People v. Scott* (1996) 14 Cal.4th 544, 555 [59 Cal.Rptr.2d 178, 927 P.2d 288] (conc. opn. of Mosk, J.); see *Bland, supra,* 28 Cal.4th at p. 323 [quoting *Scott* (conc. opn. of Mosk, J.) with approval]; *People v. Albright* (1985) 173 Cal.App.3d 883, 887 [219 Cal.Rptr. 334] [implied malice does not require awareness of life-threatening risk to a particular person]; *People v. Stein* (1913) 23 Cal.App. 108, 115 [137 P. 271] ["malice will be implied, although the perpetrator of the act had no malice against any particular person of the multitude into which he so fired"].) When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim.

■ To illustrate, in *People v. Watson* (1981) 30 Cal.3d 290, 293–294 [179 Cal.Rptr. 43, 637 P.2d 279], the defendant killed a mother and her six-year-old daughter while driving under the influence of alcohol. We found the evidence supported a conclusion that the "defendant's conduct was sufficiently wanton" (*id.* at p. 300) to hold him to answer on two charges of second degree murder (*id.* at pp. 294, 301). Nowhere in our discussion did we indicate the defendant was required to have a subjective awareness of his particular victims, i.e., the mother and daughter killed, for an implied malice murder charge to proceed. Nothing in the language of section 187, subdivision (a), allows for a different analysis for a fetus. Indeed, had the mother in *Watson* been pregnant, it is difficult to see any logical basis on which to argue the defendant could not have been held to answer for three charges of second degree murder.

Here, as the Attorney General notes, defendant "knowingly put human life at grave risk when he fired his gun twice in an occupied apartment building." As the Attorney General observed during oral argument, if a gunman simply walked down the hall of an apartment building and fired through the closed doors, he would be liable for the murder of all the victims struck by his bullets—including a fetus of one of his anonymous victims who happened to be pregnant. Likewise, defense counsel conceded at oral argument that

defendant would be guilty of implied malice murder if one of his bullets had struck an infant concealed by the bedcovers. On this point, both counsel are right. Had one of Fansler's other children died during defendant's assault, there would be no inquiry into whether defendant knew the child was present for implied malice murder liability to attach. Similarly, there is no principled basis on which to require defendant to know Fansler was pregnant to justify an implied malice murder conviction as to her fetus.

■ ▪ In battering and shooting Fansler, defendant acted with knowledge of the danger to and conscious disregard for life in general. That is all that is required for implied malice murder. He did not need to be specifically aware how many potential victims his conscious disregard for life endangered.

Moreover, section 12022.9 provides for a sentence enhancement under certain circumstances for a defendant's personal infliction of injury on a pregnant woman resulting in the termination of the pregnancy. It applies only when the defendant "knows or reasonably should know that the victim is pregnant." (§ 12022.9.) As the Attorney General notes, the "fact that the Legislature explicitly imposed a knowledge requirement in section 12022.9, but not in section 187," further confirms no such knowledge requirement was intended for implied malice murder.

Relying on *People v. Dennis* (1998) 17 Cal.4th 468 [71 Cal.Rptr.2d 680, 950 P.2d 1035], defendant asserts that this court has held or assumed that implied malice must be shown separately with respect to the fetus. In *Dennis*, the defendant killed his ex-wife, who was eight months pregnant, and her fetus with a machete-like weapon. As a result of cuts to the mother's abdomen, the fetus was expelled and suffered severe chopping wounds. (*Id.* at pp. 489, 495–496.) The jury convicted defendant of the first degree murder of the mother and second degree murder of the fetus. (*Id.* at p. 489.) In connection with defendant's claim that his penalty was disproportionate, we stated, "Defendant notes the jury made no express finding of his premeditation, deliberation, or intent to kill the fetus, and he suggests the jury's verdict may even imply a finding he was unaware of the fetus's existence. We disagree. The jury's verdict of second degree murder necessarily found that at the very least, defendant bore implied malice toward the fetus. [Citation.] The jury was so instructed." (*Id.* at p. 512.) In connection with defendant's claim of instructional error, we stated, "[t]he instructions made plain that malice was a separate element that had to be proved for each of the two murders charged. The trial court instructed the jury that a verdict of guilt of the alleged fetal murder required a finding that defendant killed the fetus with malice aforethought. . . . It is not reasonably likely the instructions misled the jury into thinking it could convict defendant of two murders while finding malice aforethought only as to one victim's death." (*Id.* at pp. 514–515.)

In *Dennis*, we simply noted the jury was required to find malice as to the fetus in order to convict the defendant of his murder; we did not say how such malice was demonstrated. To the extent *Dennis* assumed that a defendant must have a requisite mental state as to a *specific* victim, that assumption was unexamined and unnecessary to rejecting the defendant's claim of disproportionate penalty or instructional error.

Defendant also asserts that the legislative history of section 187 demonstrates that the Legislature did not intend to hold a defendant liable for the murder of a fetus unless he had knowledge the woman was pregnant. Prior to 1970, the killing of a fetus was not murder. In *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 623 [87 Cal.Rptr. 481, 470 P.2d 617], a fetus was deliberately " 'stomp[ed] out of' " the mother, but this court held a fetus was not a "human being" within the meaning of former section 187, subdivision (a). Following *Keeler*, the Legislature amended section 187, subdivision (a) to provide that murder was the unlawful killing of either a human being or a fetus. (Stats. 1970, ch. 1311, § 1, p. 2440.) Relying on a law review article interpreting the legislative history of this amendment, defendant contends, "the stated purpose of the bill's author was 'to make Robert Keeler's actions susceptible to a charge of murder.' "

The language of section 187, subdivision (a), that "[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought," is clear, making resort to its legislative history unnecessary. Moreover, we find no such stated purpose in the legislative history. In any event, given *Keeler* was the motivating force behind the 1970 amendment to section 187, subdivision (a), any references in the legislative history as to how the amendment would punish "Keeler's actions," which involved an intentional attack on a fetus, are to be expected and do not preclude our interpretation here.

Nor is the fact that the Legislature chose to simply include fetuses in the statute, and not separately define them as human beings, indicative of any intent to modify the existing law of murder which, as a result of the amendment, would now also apply to a fetus. As defendant himself notes, "[t]here is no suggestion in the legislative history of any intent to alter the established common-law definition of implied malice for purposes of the new crime of fetal murder." Nor, contrary to defendant's contention, are we concluding the Legislature in 1970 "imput[ed] malice to fetal life based upon malice directed to human life." Rather, by engaging in the conduct he did, defendant demonstrated a conscious disregard for all life, fetal or otherwise, and hence is liable for all deaths caused by his conduct.

Defendant further asserts that the fact that there is no crime of voluntary or involuntary manslaughter of a fetus demonstrates that the Legislature intended to "restrict the feticide provision to defendants who specifically intend to kill a fetus itself . . . or, at most, to defendants who know full well their attack on the mother will likely have this result." He also asserts, "The [L]egislature would not exclude from feticide a large class of criminal conduct posing a more palpable risk to fetal life, yet punish [defendant's] less cognizant conduct as fetal murder." Of course, a defendant who commits murder is, contrary to defendant's implicit suggestion, more culpable than one who commits voluntary or involuntary manslaughter. Moreover, the Legislature's decision to amend section 187, subdivision (a) and punish the malicious killing of a fetus, but not also amend the manslaughter statute, says nothing about the proper interpretation of the murder statute.

Finally defendant asserts that to the extent section 187 is ambiguous, it should be construed in his favor. It is not ambiguous. Nor is our conclusion today "an overruling of controlling authority or a sudden, unforeseeable enlargement of a statute" in violation of ex post facto or due process principles. (*People v. Billa* (2003) 31 Cal.4th 1064, 1072 [6 Cal.Rptr.3d 425, 79 P.3d 542].) Rather, unlike the situation in *Davis*, on which defendant relies, "there was no uniform appellate rule interpreting the pertinent statutory language contrary to our holding here when defendant" killed Fansler and her fetus. (*People v. Loeun* (1997) 17 Cal.4th 1, 12 [69 Cal.Rptr.2d 776, 947 P.2d 1313].)

### Disposition

The judgment of the Court of Appeal is reversed, and the case remanded for proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Dissenting.—A man who shoots a woman, unlawfully and intentionally causing her death, is guilty of the woman's murder, of course. If the woman is some 12 weeks pregnant, and the fetus also dies, is the man also guilty of murdering the fetus even though he did not intend to kill the fetus and did not even know of its existence?

A person may be convicted of murder of another human being on a theory of implied malice, which requires only proof of causing the victim's death by an intentional act, the natural consequences of which were dangerous to human life, with knowledge of that danger. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].) The majority asserts,

however, that for a conviction of implied malice murder of a *fetus*, it is sufficient that the person acted with conscious disregard "for life in general" (maj. opn., *ante,* at p. 869). I disagree.

The Legislature has carefully defined murder in terms of two distinct classes of victims—human beings and fetuses. The majority's reasoning effectively abrogates this important distinction by the manner in which it defines the mental state requirements for implied malice fetal murder. Instead of requiring proof of implied malice toward a particular fetus or fetuses in general, the majority requires only proof of implied malice toward "life in general." (Maj. opn., *ante,* at p. 869.)

In my view, however, a defendant is guilty of murdering a fetus on an implied malice theory only if the fetus's death resulted from the defendant's intentional act, the natural consequences of which were *dangerous to fetal life*, with knowledge of *that particular danger.*

## I.

I begin with a brief overview of the relevant law.

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187.)[1] Felony murder aside, malice—either express or implied—must be present for a killing to be murder. "Malice exists" if the "unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with awareness of the danger and a conscious disregard" for the risk to life. (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066].)

An "unlawful killing of a human being without malice" is manslaughter. (§ 192.) Certain types of provocation will "reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice.*' " (*People v. Rios, supra,* 23 Cal.4th at p. 461, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87 [96 Cal.Rptr.2d 451, 999 P.2d 675]), for example, when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)).

Fetal murder is a relatively new crime in California. Beginning in 1850, our law defined murder as "the unlawful killing of a human being, with malice aforethought." (Stats. 1850, ch. 99, § 19, p. 231.) In 1970, the

---

[1] All further statutory references are to the Penal Code.

Legislature amended that statutory definition by including "a fetus" in the definition of murder. (§ 187, as amended by Stats. 1970, ch. 1311, § 1, p. 2440.)

The amendment was in response to our decision earlier that year in *Keeler v. Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617]. In that case, the former husband of Teresa Keeler accosted her in a remote location, and upon seeing her obvious pregnancy said he was "going to stomp it out of you." (*Id.* at p. 623.) He attempted to do just that, causing the death of a five-pound female fetus. Teresa Keeler survived. When charged with murder of the fetus, the defendant contended he could not be prosecuted for fetal murder because the fetus had not been born alive and therefore was not a "human being" under our statute, which defined murder as the unlawful killing of "a human being." This court agreed, observing that in 1850, when the Legislature first enacted a statute defining murder, it had followed the common law rule that killing an unborn, but viable, fetus was not murder. (*Id.* at pp. 627–628, 637–638.) Because California had never created a crime of feticide, this court concluded in *Keeler* that the defendant could not be tried for the murder of the fetus. (*Id.* at pp. 628–631.) Dissenting in *Keeler*, Justice Burke would have permitted a prosecution for fetal murder, reasoning that the statutory term "human being" should be construed as including the killing of a viable fetus. (*Keeler v. Superior Court, supra,* 2 Cal.3d at pp. 641–645 (dis. opn. of Burke, J.).)

In response, the Legislature amended the murder statute by adding a second category of murder victim, defined only as "a fetus."[2] At the same time, the Legislature rejected a proposal to add the killing of a fetus to the definition of manslaughter. (§ 192; Comment, *Is the Intentional Killing of an Unborn Child Homicide? California's Law To Punish the Willful Killing of a Fetus* (1971) 2 Pacific L.J. 170, 172–174.) Thus, California does not recognize a crime of fetal manslaughter; "only the unlawful killing of a human being can constitute manslaughter." (*People v. Dennis* (1998) 17 Cal.4th 468, 506 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; see *People v. Brown* (1995) 35 Cal.App.4th 1585, 1592 [42 Cal.Rptr.2d 155].)

## II.

The majority starts from an unremarkable premise: A defendant who "commits an act, the natural consequences of which are dangerous to human life," with a mental state of conscious disregard for that risk, acts with implied malice toward any human beings who die as a consequence. (Maj.

---

[2] A fertilized egg becomes a fetus under section 187 " 'after major structures have been outlined,' " or about seven to eight weeks after fertilization. (*People v. Davis* (1994) 7 Cal.4th 797, 810 [30 Cal.Rptr.2d 50, 872 P.2d 591].)

opn., *ante,* at p. 868.) It then states: "There is no requirement the defendant specifically know of the existence of each victim." (*Ibid.*) To illustrate that point, the majority gives various scenarios in which a defendant fires a gun in or at an occupied apartment within a multi-unit building, killing human beings of whose presence he was unaware. It is an interesting exercise, but one that has no relevance to the issue before us. What needs to be determined here is the required mental state for implied malice murder of a *fetus,* and more specifically whether the mental state is identical to the mental state required for implied malice murder of a *human being.*

The majority asserts that when a defendant, aware of the risk, commits an act whose natural consequences are dangerous to human life, with a mental state of "a conscious disregard for life in general," he has committed implied malice murder. (Maj. opn., *ante,* at p. 868.) In sum, the majority concludes that conscious disregard "for life in general"—by which it apparently means human life as well as fetal life—is a sufficient mental state for implied malice murder of both human beings and fetuses, the two categories of murder victims specified in section 187, which defines murder. In essence, the majority holds that one whose mental state is a generalized conscious disregard for life bears that same mental state toward all "potential victims" (maj. opn., *ante,* at p. 869), even those of whom the actor is not aware.

The rule articulated by the majority may or may not be what the Legislature intended. But the majority neither acknowledges the breadth of the rule it has fashioned, nor does the majority explain why that rule is compelled by the Legislature's 1970 amendment to section 187, which added fetuses as victims of murder.

## III.

As noted above, California recognizes two categories of murder victims— human beings and fetuses. (§ 187.) It is unclear whether the state Legislature intended to create a single crime of murder applicable to both a human being and a fetus, or whether it intended to create two crimes—murder of a human being and murder of a fetus.[3] The question arises in part because the Legislature, when it amended section 187 to include a fetus as a murder victim, considered but ultimately rejected a proposal to recognize a crime of fetal manslaughter. As a result, there is a nonparallel punishment scheme for killings of human beings and for killings of fetuses, as discussed below.

---

[3] Recently, Congress enacted a federal statute creating two separate crimes: one against the mother, the other against "the unborn child." (Unborn Victims of Violence Act of 2004, Pub.L. No. 108-212 (Apr. 1, 2004) 118 Stat. 568.)

"When a killer *intentionally* but unlawfully kills in a sudden quarrel or heat of passion, the killer lacks malice and is guilty only of voluntary manslaughter." (*People v. Lasko, supra,* 23 Cal.4th at p. 104.) The effect of omitting a crime of fetal manslaughter is evident in the following scenario: A man comes home and finds his wife in bed with another man. Grabbing a handgun from the nightstand, he shoots his wife, killing her, unaware that his wife is nine weeks pregnant. Her death causes the death of the fetus. He is charged with the murders of his wife and the fetus. At trial he presents a defense of having acted in the heat of passion. The jury believes him, finding him guilty of the lesser offense of manslaughter for his wife's death. With respect to the dead fetus, the jury, having been instructed by the trial court that California has no crime of fetal manslaughter, and having found that defendant acted with provocation, which negates malice, cannot legally convict defendant of murder. Nor can it legally convict him of a lesser offense of manslaughter, because there is no crime of fetal manslaughter. Thus the killer, despite his mental state of conscious disregard for life in general, is liable only for the death of his wife (manslaughter) but not for the death of the fetus (no crime).

The lack of parallel punishment for killing a human being and killing a fetus suggests that the Legislature did not intend the crime of fetal murder to parallel that of murder of a human being. To the extent California's homicide law "attempts to sort killings according to the culpability they reflect" (Mounts, *Malice Aforethought in California* (1999) 33 U.S.F. L.Rev. 313, 314), the fact that the same murderous conduct is punished differently depending upon the type of victim, either a human being or a fetus, implies that the Legislature intended to treat fetal murders differently. If murder of a fetus is not the same crime as murder of a human being, is the mental state for murder of a fetus different from the mental state required for murder of a human being? After much thought and considerable research, I cannot answer the question. The Legislature has given no clue what it intended in this regard.

In attempting to answer the question just posed, one must recognize the biological fact that for a considerable time a fetus's presence in its mother's womb may not be readily apparent to others. What, then, is the required mental state when one kills the fetus of a woman who shows no outward signs of pregnancy, and the killer's conduct or expressions of intent do *not* permit the inference that he acted with express malice toward the fetus? Those are the cases that are difficult to grapple with. Far easier are the cases in which the defendant's actions show *express* malice toward the fetus. In the latter category is the defendant in *Keeler v. Superior Court, supra,* 2 Cal.3d at page 623, who exhibited express malice toward the fetus, both by stating his intent to "stomp" the fetus out of his pregnant former wife's belly and by proceeding to do just that. Similarly, the defendant in *People v. Dennis, supra,* 17 Cal.4th 468, demonstrated express malice toward the fetus when he

used a machete to attack his eight-months pregnant former wife, delivering such ferocious blows that he killed her and the fetus she was carrying by inflicting wounds to the wife's abdomen that cut into the fetus's torso, transecting its heart and severing its left leg. (*Id.* at pp. 489, 508, 515.)

The more difficult cases are those in which the defendant's mental state could at most be described as *implied* malice, as in the situation here. Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) To put it simply, one who acts with implied malice "necessarily acts with *knowledge* of the life-threatening harm that might occur if he proceeds with 'an act with a high probability that it will result in death.' " (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 [264 Cal.Rptr. 841, 783 P.2d 200].)

The prosecution's theory at trial was that when defendant shot and killed his former girlfriend, Patty Fansler, in an occupied apartment building, he acted with conscious disregard not only for her safety but for the safety of any human beings who might be in the building. This trial theory derives from the "zone of harm" rationale that this court described in *People v. Bland* (2002) 28 Cal.4th 313, 329 [121 Cal.Rptr.2d 546, 48 P.3d 1107]: "Where the means employed to commit the crime against a primary victim create *a zone of harm* around that victim, the factfinder can reasonably infer that the defendant [had the actual intent to kill] all who are in the anticipated zone." (Italics added.) Indeed, the majority here relies on two Court of Appeal zone-of-harm cases, one dating from 1913 and the other from 1985, for the proposition that a defendant will be liable for the death of any victim, even a victim of whose existence the defendant is unaware. (See maj. opn., *ante*, at p. 868, citing *People v. Stein* (1913) 23 Cal.App. 108 [137 P. 271] [the defendant shot repeatedly into a group of dancers in a public room of a hotel, killing one of them]; and *People v. Albright* (1985) 173 Cal.App.3d 883 [219 Cal.Rptr. 334] [the defendant, while drunk, drove at high speed, hitting and killing another driver of whose presence the defendant was unaware until moments before the collision].) The prosecution sought to apply the zone-of-harm model to the facts here. In doing so, it implicitly equated a human victim occupying an apartment in a multi-unit building with a fetal victim occupying its mother's body.

But the rule fashioned today by the majority is far broader than the prosecution's zone-of-harm theory used at trial. The only mental state the majority requires for *implied malice* murder of a fetus is that the defendant commit an act whose natural consequences endanger "life in general" or "all life, fetal or otherwise." (Maj. opn., *ante*, at pp. 868, 870.) Thus, the majority implicitly concludes that the crime of fetal murder may be committed by one who acts only with conscious disregard for human victims, even when the

actor's conduct kills no living human being, but causes the death of a fetus. Under the majority's rule, when one commits an act directed at a female victim and does so with an awareness that it carries a substantial risk to her life, that mental state suffices to establish implied malice murder of a fetus in her womb whose existence is neither apparent nor known to the actor. Suppose that defendant, while alone with Patty Fansler in the apartment, had beaten her severely, putting her life in peril. Suppose defendant did not know that Fansler was carrying three 12-week-old fetuses. And suppose that although Fansler recovered from her injuries, the beating caused the death of her three fetuses. Under the majority's holding, defendant in this scenario would be liable for the implied-malice second degree murder of each of the three fetuses, of whose existence defendant was ignorant, based entirely on his mental state of implied malice toward life in general when he attacked Fansler.

It is unclear whether the 1970 Legislature in amending the murder statute by adding "a fetus" intended only to expand the victims of murder to include human beings *and fetuses* but to retain the same mental state for both types of victim. In amending section 187 by defining murder as the unlawful killing of a human being *or* a fetus, the Legislature did not add language such as, "For purposes of this section a human being includes a fetus." Nor did it make fetal manslaughter a crime. What exactly the Legislature intended is unclear. I urge the Legislature to revisit the criminal laws applicable to fetal killings to resolve the uncertainties in this difficult area.

When interpreting a law defining a crime, and the statutory language is susceptible to two equally reasonable constructions, it is the policy in this state to construe the statute in the defendant's favor lest defendants not have fair warning of what conduct is prohibited. (*People v. Avery* (2002) 27 Cal.4th 49, 57–58 [115 Cal.Rptr.2d 403, 38 P.3d 1]; *People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Absent some clear indication of what mental state the Legislature intended for implied malice murder of a fetus, I would hold that a defendant who neither knows nor has reason to suspect that his female victim is pregnant, is not liable for the implied malice murder of a fetus who dies as a result of a murderous attack on the fetus's mother.

I would affirm the Court of Appeal's judgment reversing defendant's conviction for the second degree murder of Fansler's fetus.

Appellant's petition for a rehearing was denied June 23, 2004. Kennard, J., was of the opinion that the petition should be granted.