[No. F044054. Fifth Dist. June 2, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ROGELIO CALDERON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion.

## Counsel

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, J. Robert Jibson and Raymond L. Brosterhous, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**VARTABEDIAN, J.**—In Tulare County Superior Court case No. 01-73627, appellant Jose Rogelio Calderon stands convicted, following a jury trial, of second degree murder (Pen. Code, § 187, subd. (a); count 1), evading an officer with willful or wanton disregard for safety (Veh. Code,[1] § 2800.2, subd. (a); count 2), being a felon in possession of a firearm (Pen. Code, § 12021 , subd. (a)(1); count 3), leaving the scene of an accident resulting in death (§ 20001, subd. (a); count 4), unlawfully driving or taking a vehicle (§ 10851, subd. (a); count 5), driving under the influence of alcohol or drugs (§ 23152, subd. (a); count 7), and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a); count 8). The jury acquitted him of grand theft of a firearm (Pen. Code, § 487, subd. (d); count 6).[2] Sentenced to an aggregate term of 17 years 8 months to life in prison (which included a concurrent term for violation of probation in case No. 01-68605) and ordered to pay restitution and a restitution fine, he now appeals, raising various claims of error.[3] For the reasons that follow, we reverse the murder conviction and remand the matter for further proceedings.

### FACTS

Sometime between 11:00 p.m. on April 15 and 4:00 a.m. on April 16, 2001, someone stole Gail Stroud's silver PT Cruiser from inside the garage of her Farmersville residence. Stroud kept a handgun inside a box in the glove compartment. She reported the theft to police.

---

[1] Further statutory references are to the Vehicle Code unless otherwise stated.

[2] The record on appeal does not reflect the disposition of the "strike" allegation appended to the various felony counts in the information, although it appears from the probation officer's report that the prior offense was not a "strike" within the meaning of the three strikes law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(e)). Additionally, Enrique Gomez was jointly charged with appellant in counts 5 and 6. Count 6 was dismissed as to Gomez pursuant to Penal Code section 1118.1. He was convicted on count 5. His case is not before us at this time.

[3] Upon appellant's petition, we permitted the filing of a belated notice of appeal.

At approximately 1:22 p.m. on April 16, Tulare County Sheriff's Deputy Cantu received a "be on the lookout" broadcast concerning the vehicle. An hour or two later, he spotted the vehicle in Goshen. The PT Cruiser, which contained four occupants, failed to yield to Cantu's red lights and siren, and accelerated away from him. A pursuit ensued.

The driver of the PT Cruiser, who was subsequently identified as appellant, proceeded through Goshen at approximately 35 to 40 miles per hour. The speed limit was 25 miles per hour. He ran five or six stop signs in town, and at one point drove through someone's yard, knocking down a cyclone fence on either side. Although vehicular traffic in town was fairly light, there were a lot of pedestrians in the area.

Appellant tried to elude Cantu by driving circularly around city blocks; when he was unsuccessful, he headed out of town. Once on the highway, his speed reached approximately 80 miles per hour in a 55-mile-per-hour zone. At one point, appellant slowed down somewhat when confronted with traffic, then ran a red light at approximately 45 to 55 miles per hour, then sped up again to around 80 miles per hour. Vehicles going both directions on the two-lane highway were yielding; however, appellant was driving erratically and passing vehicles that did not pull over quickly enough. A couple of times, he nearly struck another vehicle head-on. Cantu estimated that appellant passed 10 to 15 vehicles.

Approximately 10 minutes after Cantu first saw the vehicle, California Highway Patrol Officer Yokley took over as the primary pursuit unit. At this point, speeds were exceeding 100 miles per hour. Traffic was such that there might be a dozen cars, then a small gap, then five or six more vehicles, then another small break.

Approximately a quarter to half a mile after Yokley took the lead, the PT Cruiser, which was traveling northbound, and a blue or silver vehicle, which was traveling southbound, approached a two-lane bridge over the Saint John's River.[4] A white pickup truck pulling a trailer was traveling northbound in front of the PT Cruiser. The truck did not yield to the officers' lights and sirens, but instead proceeded across the bridge. The PT Cruiser attempted to pass the truck and trailer; the southbound vehicle was in the center of the bridge and had nowhere to go. It attempted to swerve to the right and hit the guardrail, at which point the PT Cruiser, going northbound in the southbound lane, struck the right front of the vehicle. The southbound vehicle, which was driven by Hector Gutierrez, basically stopped where it had been hit. It

---

[4] Because the bridge is slightly elevated, someone driving southbound may not see a vehicle traveling northbound. Except at the bridge, the shoulder is wide enough to permit a car to pull off of the road.

sustained severe damage to the driver's side of the engine compartment and door. The PT Cruiser spun into the truck and trailer, which also began to spin.

When the PT Cruiser came to a stop, appellant crawled out of the driver's window and fled. Yokley chased him for a third to a half of a mile, at which point appellant surrendered. Meanwhile, Cantu took custody of the PT Cruiser's three remaining occupants, who also had exited the vehicle. A loaded, small-caliber semiautomatic handgun was found on the driver's side floorboard of the car.

Hector Gutierrez was not moving and was bleeding profusely from the head, although he still had a pulse when the first officer reached him. He died later that day. The primary cause of death was a broken neck. Contributing factors included a flail chest (traumatic breakage of multiple ribs, resulting in collapsed and lacerated lungs) and blunt trauma injuries to the abdomen, mainly a lacerated liver.

A sample of blood taken from appellant was negative for alcohol. However, methamphetamine was present at a level of 50 nanograms per million. At this level, appellant was under the influence of methamphetamine for purposes of safety-sensitive operations such as driving a car.

## DISCUSSION

### I

### *The Second Degree Murder Conviction Must Be Reversed*

 The jury was instructed on two theories of second degree murder: implied malice and felony murder based on the violation of section 2800.2. Appellant argues the trial court erred by instructing on the latter theory because a violation of section 2800.2, evading a pursuing peace officer while driving with willful and wanton disregard for the safety of persons or property, is not an inherently dangerous felony and therefore cannot serve as the predicate offense for a second degree felony-murder conviction. The California Supreme Court recently agreed. (*People v. Howard* (2005) 34 Cal.4th 1129, 1138–1139 [23 Cal.Rptr.3d 306, 104 P.3d 107].) The People concede the error, but claim it was harmless.

 A "legally incorrect theory" is one "which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense." (*People v. Harris* (1994) 9 Cal.4th 407, 419 [37 Cal.Rptr.2d 200, 886 P.2d 1193], fn. omitted.) When the prosecution presents its case to the jury on alternate theories, one of which is legally correct and the other legally incorrect, "we must reverse the conviction unless it is beyond a reasonable doubt that the error did not contribute to the jury's verdict.

(*People v. Swain* (1996) 12 Cal.4th 593, 607 [49 Cal.Rptr.2d 390, 909 P.2d 994], citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Such a reasonable doubt arises where, although the jury was instructed on alternate theories, there is no basis in the record for concluding that the verdict was based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1121–1122, 1126–1129 [17 Cal.Rptr.2d 365, 847 P.2d 45], applying *People v. Green* (1980) 27 Cal.3d 1, 62–74 [164 Cal.Rptr. 1, 609 P.2d 468] [overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512] & *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99]].)" (*People v. Smith* (1998) 62 Cal.App.4th 1233, 1238 [72 Cal.Rptr.2d 918].) "An instructional error presenting the jury with a legally invalid theory of guilt does not require reversal, however, if other parts of the verdict demonstrate that the jury necessarily found the defendant guilty on a proper theory. (*People v. Guiton, supra,* 4 Cal.4th at p. 1130.)" (*People v. Pulido* (1997) 15 Cal.4th 713, 727 [63 Cal.Rptr.2d 625, 936 P.2d 1235].)[5]

Here, the prosecutor argued both theories to the jury; jurors were never told they had to agree unanimously on one theory or the other;[6] and the general verdict returned by the jury does not indicate upon which theory jurors relied. Nevertheless, we understand the People to argue that, based on the instructions actually given, jurors had to find equivalent mental states

---

[5] Relying on *People v. Harris, supra,* 9 Cal.4th at pages 419–424, the People argue for application of the harmless error test traditionally applied to misinstruction on the elements of an offense, which the People view as "more lenient than the 'correct reliance' test" of *People v. Green, supra,* 27 Cal.3d 1. However, the error in *Harris* was not submission to the jury of a *legally* incorrect theory, but the giving of an instruction which would have permitted the jury to convict based on a *factually* insufficient scenario (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1034 [68 Cal.Rptr.2d 655, 945 P.2d 1204]; *People v. Harris, supra,* 9 Cal.4th at pp. 416–419)—in other words, a misdescription of an element of the offense (see *People v. Hagen* (1998) 19 Cal.4th 652, 670 [80 Cal.Rptr.2d 24, 967 P.2d 563]; *People v. Flood* (1998) 18 Cal.4th 470, 495 [76 Cal.Rptr.2d 180, 957 P.2d 869]). Here, by contrast, the jury was presented with a legally incorrect theory that could not, as a matter of law, support a conviction of second degree murder. (*People v. Howard, supra,* 34 Cal.4th at pp. 1138–1139; see *People v. Smith, supra,* 62 Cal.App.4th at p. 1238 [erroneous instruction on extortion as predicate offense for second degree felony murder].) Because "[t]he felony-murder rule generally acts as a substitute for the *mental state* ordinarily required for the offense of murder" (*People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549]), the doctrine " 'operates to posit the existence of that crucial mental state' " and thereby renders irrelevant evidence of malice or the lack thereof. (*Ibid.*) Thus, "[o]rdinarily, when a defendant commits an unintentional killing, a murder conviction requires a showing that he acted with implied malice. [Citation.] With the felony-murder rule, however, such malice need not be shown. [Citation.]" (*Ibid.*) Accordingly, the jury in appellant's case need not even have considered the element of malice, a different situation than existed in *Harris.* In any event, we need not decide whether the tests of prejudice are truly different, since we find reversal required under either.

[6] The law does not require unanimous agreement on a theory of guilt of murder. (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

under either theory; hence, if they found the mental state required for felony murder based on a violation of section 2800.2, they necessarily also found implied malice.

The trial court told the jury that in order to prove the crime of murder, it must be proved that a human being was killed, the killing was unlawful, and "the killing was done with malice aforethought or occurred during the commission of a felony inherently dangerous to human life." With respect to implied malice murder, the court instructed: "Murder in the second degree is the unlawful killing of a human being when one, the killing resulted in [sic] an intentional act. Two, the natural consequences of the act are dangerous to human life. And three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life. When the killing is a direct result of such act it is not necessary to prove that the defendant intended that the act would result in the death of a human being." Concerning felony murder, the court told jurors: "The unlawful killing of a human being whether intentional or unintentional or accidental which occurs in the commission of the crime of a violation of Vehicle Code Section 2800.2(a), felony fleeing of peace officer in willful or wanton disregard for the safety of persons, is murder of the second degree when the perpetrator had the specific intent to commit the crime. And that specific intent must be proved beyond a reasonable doubt."

The foregoing instructions told jurors that a violation of section 2800.2 was inherently dangerous to human life if a willful and wanton disregard for the safety of persons was shown. The question we must answer is whether "willful or wanton disregard for the safety of persons" is the equivalent of "conscious disregard for human life." If so, appellant's murder conviction may stand. In our opinion, however, the two are not the same.

■ When section 2800.2 is viewed in the abstract, it is readily apparent that the mental state necessary for commission of that crime is not the equivalent of that required for implied malice murder. First, the statute can be violated where the disregard is for the safety of persons *or* property, as the jury was instructed with respect to count 2, the substantive felony evading charge. Second, subdivision (b) of the statute provides: "For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs." As the California Supreme Court has observed, violations that are assigned points under section 12810 can be committed without endangering human life. (*People v. Howard, supra,* 34 Cal.4th at p. 1137.)

Here, the jury was not given the option of finding felony murder based on disregard for the safety of property, nor was it given the definition contained in section 2800.2, subdivision (b). (See *People v. Howard, supra,* 34 Cal.4th at p. 1144 (dis. opn. of Baxter, J.).) Nevertheless, we conclude that, under the instructions given, the mental state jurors were required to find in order to convict appellant on a theory of felony murder is not the equivalent of that they were required to find in order to convict him on a theory of implied malice murder.

■ Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) Thus, as the jury was instructed here, " 'malice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." [Citation.]' [Citation.]" (*People v. Robertson* (2004) 34 Cal.4th 156, 164 [17 Cal.Rptr.3d 604, 95 P.3d 872].) " '[I]mplied malice has both a physical and a mental component, the physical component being the performance " 'of an act, the natural consequences of which are dangerous to life,' " and the mental component being the requirement that the defendant " 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' [Citation.]" (*People v. Taylor* (2004) 32 Cal.4th 863, 868 [11 Cal.Rptr.3d 510, 86 P.3d 881].)

The phrase "willful or wanton" was not defined for the jury in conjunction with the murder instructions. While instructing the jury on count 2, the court stated: "Willful and wanton means an act or acts intentionally performed with a conscious disregard for the safety of persons and property and does not necessarily include an intent to injure." Because jurors were told to consider the instructions as a whole, and we presume they understood and correlated the instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129, 29 P.3d 209]; *People v. Ayers* (2005) 125 Cal.App.4th 988, 997 [23 Cal.Rptr.3d 242]), we assume this is the definition they applied to count 1, omitting the safety-of-property aspect.

■ In *People v. Dellinger* (1989) 49 Cal.3d 1212, 1218–1221 [264 Cal.Rptr. 841, 783 P.2d 200], the California Supreme Court considered two definitions which had evolved to describe the mental state required for implied malice and equated "wanton disregard for human life" with "conscious disregard for life." Thus, we assume that, for our purposes, the "wanton disregard" contained in the instructions applicable to section 2800.2 is the equivalent of the "conscious disregard" contained in the instructions applicable to implied malice.

■ However, our inquiry does not end there. In our view, there is a subtle but, in the present context, inescapable, difference between disregard for the *safety* of persons and disregard for human *life*.[7] An act is dangerous to life, for purposes of implied malice, when there is a high probability it will result in death. (See *People v. Patterson, supra,* 49 Cal.3d at pp. 626–627; *People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) Such an act is required before implied malice may be found. (See, e.g., *People v. Sanchez* (2001) 86 Cal.App.4th 970, 975–976 [103 Cal.Rptr.2d 808, 103 Cal.Rptr.2d 809]; *People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704 [15 Cal.Rptr.2d 512].) Yet an act may endanger a person's safety without carrying such a risk. Moreover, a disregard for safety may encompass a disregard for life, but it need not do so. A person might be willing to risk causing minor injuries while attempting to evade police, yet might very well not be willing to risk causing serious injury or death.

That the requisite mental states involve disregard of differing threshold levels of risk is implicit in the provisos contained in the respective instructions. Thus, CALJIC No. 8.31 (second degree murder—killing resulting from unlawful act dangerous to life) tells jurors that the defendant need not have intended that his or her act would result in *death.* CALJIC No. 12.85 (flight from pursuing peace officer—reckless driving) tells jurors that "willful or wanton" need not include an intent to *injure.* This distinction was contained in the instructions given here. Drawing such a distinction is also consistent with the purpose behind section 2800.2, which is to deter drivers from fleeing peace officers. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1999 (1995–1996 Reg. Sess.) as introduced Jan. 8, 1996, pp. 1–2, at <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_1951-2000/ab_1999_cfa_960311_082021_asm_comm.html> [as of June 2, 2005].) The Legislature reasonably could seek to deter flight posing a risk of injury, not just that posing a risk of serious bodily harm or death.

In light of the foregoing, we conclude that, under the instructions given here, a jury finding the mental state required for felony murder would not necessarily have found that required for implied malice murder. Accordingly, we cannot determine, beyond a reasonable doubt, that the erroneous presentation of the felony-murder theory did not contribute to the verdict. (See *Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Pulido, supra,* 15 Cal.4th at p. 727; *People v. Guiton, supra,* 4 Cal.4th at p. 1130.)

---

[7] We are aware that the court in *People v. Johnson* (1993) 15 Cal.App.4th 169 [18 Cal.Rptr.2d 650] appears to have equated the two in its statement that a felony violation of section 2800.2 has, as its key element, wanton disregard for human life. (*Johnson, supra,* at p. 173.) That case was decided under an earlier version of the statute, however (see *People v. Howard, supra,* 34 Cal.4th at p. 1137), and was not concerned with the issue we face, but with whether the statute described an inherently dangerous felony. Other cases that have likened the two have done so without analysis.

Nor does our conclusion change when we consider the evidence before the jury. (See *People v. Harris, supra,* 9 Cal.4th at pp. 424–431.) Appellant's conduct, which is described *ante,* would certainly support a finding of implied malice, and he can be retried on that theory of second degree murder. We cannot, however, find the evidence conclusive on the point or say "the conclusion is inescapable that the evidence . . . is 'of such compelling force as to show beyond a reasonable doubt' that the erroneous instruction 'must have made no difference in reaching the verdict obtained.' [Citation.]" (*Id.* at p. 431, quoting *Yates v. Evatt* (1991) 500 U.S. 391, 407 [114 L.Ed.2d 432, 111 S.Ct. 1884], disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].) The mental state evidence was not uncontroverted; we are simply not prepared to say that no rational juror could have failed to find appellant harbored implied malice. (See *Neder v. United States* (1999) 527 U.S. 1, 19 [144 L.Ed.2d 35, 119 S.Ct. 1827]; *People v. Williams* (2003) 31 Cal.4th 757, 760 [3 Cal.Rptr.3d 684, 74 P.3d 779]; *People v. Nguyen* (2000) 24 Cal.4th 756, 765 [102 Cal.Rptr.2d 548, 14 P.3d 221].)

Two cases illustrate this point. In *People v. Watson, supra,* 30 Cal.3d 290, the defendant consumed enough alcohol to raise his blood-alcohol content to a level that would support a finding he was legally intoxicated. He drank himself to the point of intoxication despite knowing he thereafter would have to operate a motor vehicle. Once behind the wheel, he drove at "highly excessive speeds" through city streets, nearly colliding with another vehicle after running a red light. He avoided the collision by skidding to a stop, but then resumed his excessive speed before becoming involved in the fatal collision. (*Id.* at pp. 300–301.) Although the California Supreme Court found a rational ground for concluding the defendant's conduct was sufficiently wanton to hold him for trial on a second degree murder charge, it cautioned: "We do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction. . . . We merely determine that the evidence before us is sufficient to uphold the second degree murder counts in the information, and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Id.* at p. 301.)

In *People v. Schmies* (1996) 44 Cal.App.4th 38 [51 Cal.Rptr.2d 185], an officer observed the defendant driving his motorcycle down Interstate 5, at 4:30 p.m., at approximately 90 miles per hour. When the officer activated his lights for a traffic stop, the defendant slowed down, looked over his shoulder,

and then accelerated. A multiunit pursuit ensued along the freeway, with speeds exceeding 90 miles per hour. At some point, the defendant exited the freeway, whereupon he drove through stop signs, ran red lights, and crossed double yellow lines to weave around cars. Speeds approached 95 miles per hour. The defendant drove through one intersection, followed by an officer; a second patrol car collided with a vehicle that had started through the intersection, killing the driver. The defendant drove on, but was eventually captured. All told, the pursuit covered approximately 5.5 miles. (*Id.* at pp. 43–44.) At trial, the defendant did not offer any evidence, although he did stipulate to being the driver of the motorcycle involved in the chase, and to knowing his driver's license had been revoked at the time of the incident. The thrust of his defense was that the actions of the driver of the second patrol car were a superseding intervening act, breaking the chain of causation and relieving the defendant of liability for the death of the other driver. (*Id.* at p. 45.) Although jurors rejected the defense theory and found the defendant liable for the death by finding him guilty of vehicular manslaughter with gross negligence, they nonetheless acquitted him of second degree murder. (*Ibid.*)

We recognize that neither of the foregoing cases addresses the issue before us. Nevertheless, they demonstrate that facts similar to ours need not necessarily result in a finding of implied malice.[8]

## II

### *Appellant Did Not Receive Prejudically Ineffective Assistance of Counsel**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[8] Our reversal of appellant's second degree murder conviction makes it unnecessary for us to address his remaining contentions regarding that offense, i.e., that application of the second degree felony-murder rule based on section 2800.2 is precluded by the Legislature's intent to punish such conduct under section 2800.3 or upon proof of malice under Penal Code section 188; the jury was erroneously instructed regarding the effect of intoxication on the mental state necessary for second degree murder; the trial court incorrectly instructed the jury that second degree murder required general intent; and appellant was denied the effective assistance of counsel because his trial attorney's closing argument effectively eliminated his primary defense to the murder charge.

*See footnote, *ante*, page 1301.

## DISPOSITION

The judgment in case No. 01-73627 is reversed on count 1, but is affirmed as to the remaining counts. The judgment in case No. 01-68605 is affirmed. The matter is remanded for further proceedings consistent with this opinion.

Ardaiz, P. J., and Buckley, J., concurred.

On June 27, 2005, the opinion was modified to read as printed above.