Filed 9/14/15  P. v. Farley CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049516 |
| v. | (Super. Ct. No. 11HF1409) |
| AUSTIN JEFFREY FARLEY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James R. Brandlin, Judge.  (Judge of the L.A. Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal.Const.)  Affirmed as modified.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

While inebriated, Austin Jeffrey Farley drove a pickup truck into another vehicle, killing one of its passengers and injuring four others. A jury convicted Farley, as charged, of one count (count 1) of second degree murder (Pen. Code, § 187, subd. (a)), one count (count 2) of driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (a)), and one count (count 3) of driving with a blood-alcohol level of 0.08 percent or more causing bodily injury (*id.*, § 23153, subd. (b)). As to counts 2 and 3, the jury found to be true two enhancement allegations under Penal Code section 12022.7 of infliction of great bodily injury.

The trial court sentenced Farley to a prison term of 21 years to life, consisting of the upper term of three years on count 2, a consecutive term of three years for an enhancement on count 2, and a consecutive, indeterminate term of 15 years to life on count 1. Sentence on count 3 and on the enhancements to that count was imposed and execution of sentence was stayed under Penal Code section 654.

With respect to each of Farley's contentions, we conclude:

1. The evidence of implied malice was sufficient to uphold the conviction for second degree murder.

2. The trial court did not err in admitting evidence of the facts regarding a prior drunk driving conviction. Even if the trial court erred by allowing evidence of an incident of uncharged reckless driving, the jury instructions rendered any error harmless.

3. The trial court did not err by allowing testimony about statements made at a Mothers Against Drunk Driving (MADD) victim impact panel attended by Farley.

4. Farley's trial counsel was not ineffective by failing to object and move to strike cross-examination testimony of Farley's expert psychologist, and any error by the trial court in overruling certain other objections was harmless.

5. Farley's trial counsel was not ineffective by conceding the knowledge element of implied malice in closing argument.

2

6. There was no cumulative error.

7. Sentence on the enhancement that was incorrectly imposed against count 1 must be vacated.

8. Credits were stated correctly in the abstracts of judgment

We therefore vacate the sentence on the enhancement on count 1 and in all other respects affirm.


**FACTS**

**I.**

**The Fatal Collision**

At about 1:15 a.m. on May 29, 2011, M.G. was driving his 2008 Mercedes Benz northbound on Culver Drive in the City of Irvine. He had picked up his 14-year-old daughter, P.G., and her friends, K.M., A.R., and A.S., at a friend's house and was taking them home. As M.G. approached the intersection with Irvine Boulevard, he noticed, in a southbound lane of Culver Drive, a vehicle that seemed to be slowly turning left against a red light into the intersection. The light was green for M.G., and he flashed his high beams once or twice "to get the driver's attention" before proceeding into the intersection.

The vehicle, a 2003 Dodge pickup truck driven by Farley, did not stop, but accelerated. Farley drove the truck through a red light, made a left turn into the intersection, and struck M.G.'s car on the driver's side between the driver's door and the passenger door. The impact caused M.G.'s car to spin 180 degrees counterclockwise, travel northward, and strike a light pole at the northeast corner of the intersection.

A.S., who was seated in the driver's side rear passenger seat, was killed. The cause of death was blunt cranial cerebral trauma. K.M., who was seated in the middle of the rear passenger seat, suffered broken ribs, a punctured lung, an inflamed spleen, and lacerations to her face.

3

Neither Farley nor his passenger, J.R., was injured. Immediately after the crash, J.R. heard Farley say, "I'm fucked." Farley tried to drive away, but his truck was badly damaged and stalled in the middle of the road, 30 to 40 feet from the crash site.

Timothy Song was driving home and was stopped at a red light on Irvine Boulevard when the collision occurred. When, a few seconds later, Song had a green light, he drove to M.G.'s car, stopped, and turned on his car's hazard lights. Song got out of his car, ran to the Mercedes, and asked if everyone was all right. Someone from inside the Mercedes asked Song to get the license number of the other vehicle. Song walked over to Farley's pickup truck. He noticed the truck's rear wheel was still spinning. When Song asked if Farley and J.R. were okay, J.R. asked Song, "is she dead? . . . [T]he girl, is she okay? Is she alive?"

Irvine Police Officer Sean Metevia arrived at the scene at 1:19 a.m. When Metevia approached Farley's truck, the engine was still running. Metevia noticed that Farley's eyes were watery and bloodshot. Metevia heard J.R. say to Farley, "you didn't see the red" and Farley respond, "light was green."

Farley acknowledged that he had been drinking. He told the police officers he drank two or three beers during the course of the evening and did not feel the effects of the alcohol. A test of a blood sample drawn from Farley at 2:59 a.m. showed a blood-alcohol level of 0.20 percent. The forensic scientist who conducted the test estimated that Farley's blood-alcohol level at 1:15 a.m. had been 0.22 percent to 0.23 percent. The scientist believed that a man of Farley's height (six feet two inches) and weight (220 pounds) would have to drink 15 to 16 "standard drinks" to reach a 0.23 percent blood-alcohol level. Surveillance video showed that Farley and J.R. had been at a bar from 10:14 p.m. to 12:34 a.m.

Farley's blood sample also had a therapeutic level of clonazepam (Klonopin), a form of benzodiazepine that is prescribed for stress or as an antiepileptic. Klonopin is a central nervous system depressant and can intensify the effects of alcohol.

4

Farley took Klonopin to treat obsessive-compulsive disorder (OCD) and severe anxiety, and earlier on the day of the collision, he had taken two pills instead of the prescribed dosage of one pill.

## II.

## Farley's Police Interview

Farley was taken into custody and interviewed by Irvine Police Officer Allyson Maddy at 6:07 a.m. on May 29, 2011. An officer named Meyer also was present. When Farley entered the interview room, Maddy noticed he emitted a strong odor of alcohol. The interview started once Farley was read his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.

During the interview, Farley said that on May 28, 2011, he had been at his friend Zach's house and, from there, took a taxi to the "Dubliner" bar to celebrate his 26th birthday. Farley took a taxi to the Dubliner so he would not have to drink and drive. Farley said he was at the Dubliner for about 30 minutes and drank "a couple of beers." From the Dubliner, Farley took a taxi back to Zach's house, where he had left his truck. Farley and J.R. had started an argument at the Dubliner, and they continued to argue on the taxi ride and for an hour outside of Zach's house.

Farley said that he and J.R. decided to drive to a Del Taco restaurant in the area of Yale Street and Irvine Boulevard in the City of Irvine. They got into Farley's truck, and he drove to the Del Taco restaurant. He felt safe to drive based on the amount of time that had elapsed since he had a drink and on the fact he only drank three beers that evening. Farley drove southbound on Culver Drive, and, as he approached the intersection with Irvine Boulevard, he saw the traffic light was red for his direction of travel. He slowed the truck and, when he was about 100 feet from the signal, he saw the traffic lights for both the left turn lane and through traffic lanes had turned green. Farley entered the number one southbound left turn lane and turned left into the intersection with a green arrow signal. He said he was travelling at about 30 miles per hour when he

5

entered the intersection. When he had travelled four or five feet into the intersection, he saw a flash of light and "felt the impact" seconds later. Farley told Maddy, "some idiot fucker just booked it right in front of my car and I just smashed right into the side of him." Farley said the car was "blazing through" the intersection as though it was trying to beat the signal. After the collision, Farley was concerned about the people in the other car but was irritated because the car had pulled in front of him.

Farley said that he and J.R. had been arguing in the moments leading to the collision and J.R. was making gestures and screaming in Farley's face. J.R. did not touch him or any control mechanism on the truck, and, according to Farley, the collision would have occurred regardless of whether he and J.R. had been arguing. When asked if J.R. had been "getting physical," Farley said, "no, not really."

Farley explained that he had been prescribed Klonopin for OCD and anxiety. The prescribed dosage of Klonopin was one pill three times a day, but that day he had taken two pills instead of one. He described his OCD as "insanely severe" and his life was unmanageable because of it. The collision did not result from his OCD, and, while OCD caused Farley to want to drink, he did not drink the prior night for that reason. Due to his OCD, Farley suffers from paranoia and notices small details—"every little thing"—such as whether a particular light is burned out. Farley told Maddy and Meyer that he could not have turned left against a red light because "his OCD demons in his head would not allow it."

Maddy asked Farley about a prior collision when he was 19 years old. Farley said that while driving on Jamboree Road in Irvine, the person in the car behind him "flipped him off." Farley looked back at that person, and, on looking forward again, saw the car in front of him slam on the brakes. Farley drove into rear of that car.

Maddy also asked Farley about his arrest in 2009 for driving under the influence. Farley said he had been "insanely intoxicated" when that occurred. He served jail time, spent four months in rehabilitation, and was still on probation for that offense.

6

He had been ordered to attend a MADD panel, which he described as "just a couple of people that went up there and cried they lost somebody due to a D.U.I. or something." Farley also had been ordered to attend meetings of both Alcoholics Anonymous and Narcotics Anonymous. He thought some of the meetings were "kind of bullshit" because they did not relate to him.

When Maddy asked Farley if he knew that driving under the influence could lead to a fatality, he said that he did. Maddy asked him whether, upon his prior driving under the influence (DUI) conviction, he had been advised that if he were involved in another collision and was found to be driving while intoxicated and found at fault, he could be charged with murder. Farley could not recall but said the matter might have come up at the MADD panel.

## III.

### Evidence of Knowledge That Driving While Intoxicated Is Dangerous to Human Life

On May 4, 2004, Farley received a citation for driving a vehicle as a minor with a blood-alcohol level of 0.05 percent or more. As a consequence of the citation, Farley attended a daylong alcohol awareness program. Gay Sandoval, who worked for a company that provided the alcohol awareness program at Orange Coast College, testified the purpose of that program was to educate the participants about the dangers of drinking or using drugs and driving. An attorney and a police officer spoke and a film was shown.

In 2009, Farley was charged with, and pleaded guilty to, misdemeanor DUI. On the plea form, as the factual basis for his plea, Farley wrote that on February 15, 2009, he "did willfully and unlawfully drive a vehicle while under the influence of alcohol with a [blood-alcohol level] of .08% or greater, to wit: .18%." Farley initialed item No. 8 on the plea form, which gave this warning: "I have been advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to

7

drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving someone is killed, I can be charged with murder."

Farley attended a MADD victim impact panel on July 2, 2009. Those in attendance at the panel were given an advisement, based on *People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson* advisement), of the dangers of drinking and driving. The *Watson* advisement warned those in attendance they could be charged with murder if they killed someone while driving under the influence of alcohol. One panel member, Sharry Graham, explained she could be subpoenaed to testify in court that she had provided the *Watson* advisement. Graham did indeed so testify at trial.

As a consequence of his 2009 DUI conviction, Farley was ordered to participate in a six-month first offender drinking and driving program, which included 15 two-hour-long group sessions, six two-hour-long alcohol education lectures, and 12 individual sessions. He completed the program in 2009. In one session on alcohol education, the participants were taught the rate at which alcohol metabolizes so that they could determine how long to wait after drinking before driving an automobile. The participants were taught that, generally speaking, one drink is metabolized in an hour.

## IV.

## Expert Psychological Testimony

Psychologist Veronica Thomas, Ph.D., was retained to conduct a psychological assessment of Farley and testified as a defense expert witness at trial. Dr. Thomas reviewed police reports and a letter from Farley's psychiatrist and spent 14 to 20 hours interviewing Farley and administering tests of cognitive function, personality, and memory.

Dr. Thomas noticed that Farley had a difficult time staying focused, "engaged in constant rituals and compulsions," and was "extremely anxious." She found that he had several psychiatric impairments, the most notable of which was OCD, which

8

caused him to engage in ritualistic, repetitive behavior. As a child, Farley had been diagnosed with attention deficit disorder and prescribed Ritalin. Although he suffered no mental, sexual, or physical abuse at home, Farley had told Dr. Thomas his primary duty was to keep the peace between a mother who was depressed and had a drinking problem and a father who had issues with "emotional regulation" and anger. After completing high school, Farley started drinking alcohol and smoking marijuana on a daily basis for recreational purposes, to calm himself down, and to help to lessen his OCD symptoms.

Farley told Dr. Thomas he had tried to commit suicide several years earlier by taking an entire bottle of Klonopin because "he couldn't live like this anymore." He had difficulty finding and keeping a job because of his need to follow rituals.

Dr. Thomas administered an intelligence test which showed that Farley had normal intelligence. She also administered a personality test (the "Minnesota Multiple Facet Personal Inventory Test"), which required Farley to answer a number of questions. He became so overwhelmed and scared by the test that he took a long time to complete it. He was anxious and had difficulty paying attention.

Dr. Thomas administered a verbal learning test, which measured memory function, and Farley "did fine" on this test. Dr. Thomas administered a neuropsychological test that measured judgment and the ability to make difficult choices. The test showed that Farley "has a need to respond to things in a certain way and has a hard time being flexible." Other tests showed that Farley did not suffer from organic brain injury and had the ability and motivation to give straightforward and honest answers to questions. The defensive way in which Farley responded to questions on a substance abuse test suggested that he has a substance dependence disorder.

Dr. Thomas diagnosed Farley as having bipolar disorder (severe mood disorder), alcohol and cannabis dependence, abuse of antianxiety medication, OCD, and personality disorder. While the OCD was "the most observable and prominent of the

9

disorders," the bipolar disorder is "associated with depression and impulsivity, frequent[] aggressiveness and difficulty getting along with other people."

## DISCUSSION

## I.

### The Evidence of Implied Malice Was Sufficient for a Second Degree Murder Conviction.

Farley was convicted of second degree murder under a theory of implied malice. He contends the evidence of implied malice was insufficient to support the conviction.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] . . .'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

A conviction of second degree murder requires a finding of malice aforethought. (Pen. Code, §§ 187, subd. (a), 189.) Malice is implied when (1) the killing results from an intentional act; (2) the natural consequence of the act was dangerous to human life; (3) the defendant knew the act was dangerous to human life; and (4) the defendant deliberately committed the act with conscious disregard for life. (*People v. Taylor* (2004) 32 Cal.4th 863, 867.) Implied malice has a physical/objective component and a mental/subjective component. (*People v. Knoller* (2007) 41 Cal.4th 139, 157;

10

*People v. Taylor*, *supra*, at p. 867.)  The physical/objective component is the commission of an act, the natural and probable consequence of which was dangerous to human life.  The mental/subjective component is the defendant's knowledge the act was dangerous to human life and the defendant's deliberate commission of the act with conscious disregard for life.  (*People v. Knoller*, *supra*, at p. 157; *People v. Taylor*, *supra*, at p. 867.)

Driving while intoxicated is an act which may support a conviction for second degree murder under an implied malice theory:  "'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.'"  (*People v. Watson*, *supra*, 30 Cal.3d. at pp. 300-301.)  Following *People v. Watson*, numerous cases have upheld second degree murder convictions based on drunk driving.  (E.g., *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1113-1115; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1080; *People v. Autry* (1995) 37 Cal.App.4th 351, 358-359; *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.)

"In summary, courts have identified factors relevant for upholding a murder conviction based on drunk driving:  '(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.'"  (*People v. Batchelor*, *supra*, 229 Cal.App.4th at p. 1114.)  Not all of these factors must be present to uphold a second degree murder conviction.  (*People v. Autry*, *supra*, 37 Cal.App.4th at p. 358; *People v. Talamantes*, *supra*, 11 Cal.App.4th at p. 973.)

The evidence established that Farley had a blood-alcohol level of 0.22 to 0.23 percent and had Klonopin in his system when he drove his truck into M.G.'s car.  Surveillance video showed that Farley arrived at the Dubliner bar at 10:14 p.m. and left at 12:34 a.m.  Within 45 minutes after leaving the Dubliner, he decided to drive his truck to

11

a Del Taco restaurant. Farley knew of the dangers of driving while intoxicated. He had attended alcohol awareness class in 2004. When he pleaded guilty to misdemeanor DUI in 2009, he initialed the warning on the plea form that "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving someone is killed, I can be charged with murder." He attended a MADD victim impact panel in July 2009, at which he was given a *Watson* advisement, and he participated in a six-month drinking and driving program, at which he learned about the rate at which alcohol metabolizes. A defendant's participation in mandatory educational programs is relevant to the issue of knowledge and awareness of the life-threatening risks of driving under the influence. (*People v. David* (1991) 230 Cal.App.3d 1109, 1115.)

Although there was no evidence that Farley had engaged in reckless or highly dangerous driving before the collision, the evidence supported a finding that he caused the collision by making the highly dangerous maneuver of making a left turn against a red light and accelerating into an intersection.

Farley argues there was no evidence of a predrinking intent to drive and he had taken a taxi to the Dubliner precisely so that he would not have to drive while intoxicated. *People v. Watson*, *supra*, 30 Cal.3d 2d 290, and its progeny do not require that all factors, including a predrinking intent to drive, be present to sustain a second degree murder conviction. (*People v. Autry*, *supra*, 37 Cal.App.4th at p. 358; *People v. Olivas* (1985) 172 Cal.App.3d 984, 988-989.) "The criminal act underlying vehicular murder is not use of intoxicating substances in anticipation of driving, but is driving under the influence with conscious disregard for life. Nothing in *Watson* states that the former is necessary to a finding of the latter." (*People v. Olivas*, *supra*, at pp. 988-989.)

A case-by-case approach is required. (*People v. Olivas*, *supra*, 172 Cal.App.3d at p. 989.) In this case, at the moment Farley decided to drive his truck to the Del Taco restaurant, he knew that doing so was dangerous to human life. He had been

drinking at a bar for several hours; he was heavily intoxicated and had taken Klonopin that day. He had a prior DUI conviction, knew of the dangers of drinking and driving, and had been given a warning about the consequences of killing someone while driving intoxicated. Farley made a left turn against a red signal and drove into M.G.'s car. As stated in *People v. Talamantes*, *supra*, 11 Cal.App.4th at page 973, "even if, when [Farley] was drinking, he did not know he would have to drive—still the evidence of implied malice is sufficient to sustain the judgment."

## II.

### Any Error in Allowing Evidence of Prior Acts of Uncharged Misconduct Was Harmless.

A. *Background*

In 2005, Farley was involved in a "road rage" incident and hit-and-run vehicle collision that did not involve intoxication. He was not charged with an offense. In 2009, Farley pleaded guilty to misdemeanor DUI.

Over Farley's objection, the trial court ruled that evidence regarding the 2005 road rage incident and of the facts behind Farley's 2009 DUI conviction was admissible under Evidence Code section 1101, subdivision (b) (section 1101(b)). The court concluded that evidence of Farley's past driving behavior was relevant to his "subjective actual awareness" of the fact that driving a vehicle in a reckless manner can cause injury or death. The court stated, "[w]hat is relevant is his state of mind when [Farley] operates a motor vehicle and whether or not he shows the type of caution that we would expect of a reasonably prudent person and his awareness of those risks."

Farley contends the trial court erred by permitting the prosecution to present evidence of the 2005 road rage incident and of the facts behind the 2009 DUI (other than the fact of the DUI conviction itself) because that evidence was inadmissible under section 1101(b) and Evidence Code section 352. The trial court's decision to admit evidence of prior uncharged acts of reckless and drunk driving under section 1101(b) is

13

reviewed under the abuse of discretion standard. (*People v. Kipp* (1998) 18 Cal.4th 349, 369; *People v. Ortiz* (2003) 109 Cal.App.4th 104, 117 (*Ortiz*).) We conclude the trial court did not err by allowing evidence of the facts behind the 2009 DUI. Although the trial court might have erred by allowing evidence of the 2005 road rage incident, any error was harmless.

B. *The Challenged Evidence*

    1. *The 2005 Road Rage Incident*

Prosecution witness Rocio Bustamante testified that sometime before 8:00 a.m. on February 10, 2005, she was driving her Honda Civic to work. Traffic was backed up. While she was on Jamboree Road near the Interstate 5 offramp, another vehicle struck her car from behind and pushed it into an intersection. Bustamante's car was totaled.

Prosecution witness Barbara Ramseyer testified that she was in her car near Jamboree Road and Interstate 5 on the morning of February 10, 2005. Looking in her rearview mirror, she noticed a GMC Yukon SUV driven by Farley, who appeared to be "anxious." Farley pulled up next to Ramseyer. He had his arm out the window and was pounding the outside of the car door. Ramseyer described him as "really angry," and she thought to herself, "I wish the light would turn green so I can get away." The traffic light turned green, but there were too many cars ahead at the intersection for anybody to move. Ramseyer testified: "I could hear him and then he started to try to get in front of me, although, there wasn't any room and so I thought, well, what do I do? So, I honked my horn thinking, okay, please just don't try to get in front because there is no room to get in front, you are going to hit me. [¶] He wasn't changing his mind to sit still, so he started moving over in front of me, so I pulled over to the median and stopped and then he came over to where I was originally in the lane, and then he was still angry and still mad. You could see it in his face. . . . [H]e just was getting angrier, and then he just floored it or accelerated really quickly, and he made a quick turn to the right and then he hit the

14

person in front of me very, very hard and she went off into the intersection and then he took off going towards Jamboree and then kind of at the last minute changed and sped, I mean, really fast down to Edinger exit, so I stopped and got out to help the lady [who] was driving.  [¶] . . . [¶] . . . When I honked my horn and he was trying to get in front, he raised his middle finger at me."

Linda Villelli, a City of Irvine civilian traffic investigator, testified she investigated the collision, which was considered to be a "hit and run."  When Villelli arrived at the scene, the suspect—Farley—was not there.  While Villelli was taking witness statements, Farley returned and told Villelli he had been trying to change lanes for quite some time but another vehicle would not let him over.  When he eventually changed lanes in front of that vehicle, the driver honked at him.  Farley "flipped . . . off" the driver and drove into the vehicle ahead of him.  After the collision, Farley panicked, drove to work, and called his parents.  His father picked him up and brought him back to the accident scene.  No evidence was presented that Farley was charged with an offense arising out of the collision.

2. *The 2009 DUI*

Irvine Police Officer Shaheen Jahangard testified that on February 15, 2009 at about 6:00 a.m., he was dispatched in response to a 911 call from Cynthia Farley, Farley's mother.  Cynthia Farley reported that she was in her car with her husband, and they were being chased by Farley, who was driving a Dodge Dakota truck.  Farley was drunk and driving erratically.  In the 911 call, Cynthia Farley said they were running red lights and speeding in order to get to the Irvine Police Department for help.

Jahangard arrived at a parking lot at the Irvine Civic Center, where he found Cynthia Farley and her husband.  Their car had collision damage to the front left bumper.  Jahangard also found Farley at the parking lot and arrested him for DUI.  When discussing this incident with Maddy, Farley said he had been "insanely intoxicated."

15

C. *Evidence Code Section 1101*

Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character, including evidence in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. The exceptions to the bar on admissibility of evidence of uncharged acts are set forth in section 1101(b) which states, in relevant part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

"'[Evidence Code s]ection 1101, subdivision (b) allows evidence of uncharged misconduct when it is relevant to establish a material fact other than the person's bad character or criminal disposition. [Citation.] The admissibility of such evidence turns largely on the question whether the uncharged acts are sufficiently similar to the charged offenses to support a reasonable inference of the material fact they are offered to prove.'" (*People v. Burnett* (2003) 110 Cal.App.4th 868, 880-881.)

Evidence of a defendant's uncharged misconduct, if relevant under section 1101(b), is subject to Evidence Code section 352. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) Evidence Code section 352 gives the trial court discretion to exclude evidence if its probative value "is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." To be admissible, evidence of a defendant's uncharged misconduct "must have substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123.)

16

D. *No Error in Allowing Evidence of the 2009 DUI*

The trial court allowed the evidence of the 2005 road rage incident and the 2009 DUI under the theory the evidence was relevant to show that Farley knew driving a motor vehicle without caution or while under the influence of alcohol was dangerous to human life. The evidence of the 2009 DUI was relevant and admissible for that purpose under section 1101(b).

Farley's conduct leading to his arrest and conviction for DUI in 2009 was relevant to demonstrating that he knew or should have known that taking the wheel of a car while intoxicated can lead to extremely reckless driving and dangerous behavior, with serious personal consequences. The jury was entitled to infer that Farley's conduct leading to the 2009 DUI imparted to Farley a knowledge and understanding of the personal and social consequences of drunk driving. Evidence of the 2009 DUI has substantial probative value that was not "greatly outweighed" by the potential for undue prejudice. (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1123.)

E. *Any Error in Allowing Evidence of the 2005 Road Rage Incident Was Harmless.*

In concluding that evidence of the 2005 road rage incident was admissible, the trial court relied on *Ortiz*, *supra*, 109 Cal.App.4th 104, in which the Court of Appeal addressed whether evidence of prior uncharged acts of reckless driving, including driving while under the influence, was admissible to prove implied malice in a situation in which the defendant was *not* driving under the influence when he committed the charged offense. The court in *Ortiz* concluded: "A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving—whether intoxication, rage, or wilful irresponsibility—the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*Ortiz*, *supra*, at p. 115.)

Farley argues *Ortiz* does not support admission of the prior uncharged misconduct evidence because the murder charge against him were based on implied

17

malice arising from driving under the influence, not from reckless driving, and the charged incident was not the culmination of a course of reckless driving. Thus, he argues, it could not be inferred that, because he engaged in unintoxicated reckless driving in 2005, he was aware that his nonreckless, intoxicated driving in 2011 was dangerous to human life.

Farley argues that evidence of prior acts of reckless driving was highly prejudicial because "[t]here is no evidence that [his] driving prior to reaching the intersection of Culver and Irvine was in any way dangerous." Farley's primary defense was that he turned left on a green turn arrow, while M.G. sped through a red light. He presented an expert traffic accident investigator and reconstructionist who testified, based on his investigations and calculations, that Farley probably entered the intersection at the end of a green left turn arrow or on a yellow left turn arrow and that Farley had the right-of-way. Evidence that Farley drove recklessly on a prior occasion could lead the jury to discount his primary defense, disbelieve his expert, and conclude he drove recklessly through a red turn arrow into M.G.'s car.

We conclude any error in allowing evidence of the 2005 road rage incident was harmless, and the jury instructions cured any prejudice. The jury was instructed that "[t]he People presented evidence that the defendant committed other acts that were not charged in this case" and that the jury could consider such evidence only for the limited purpose of deciding whether "[t]he defendant knew that driving a motor vehicle without caution and/or while under the influence of alcohol was dangerous to human life." The jury also was instructed: "Do not consider this evidence for any other purpose[.] . . . [¶] [Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.]" We presume the jury is intelligent and understood and followed the jury instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) We therefore presume the jury in this case considered the evidence of the 2005 road rage incident only for the purpose permitted by the instructions.

18

## III.

### The Trial Court Did Not Err by Allowing Testimony
### About Statements Made at a MADD Victim Impact Panel.

Farley argues the trial court erred by allowing the prosecutor to elicit from Graham testimony describing the presentations given by three speakers at the MADD victim impact panel attended by Farley on July 2, 2009. He contends her testimony was irrelevant and more prejudicial than probative.

A. *Graham's Testimony*

Graham, a prosecution witness, testified she is a victim advocate for MADD and works with MADD victim impact panels. She identified her name on a sign-in sheet for speakers, staff, and volunteers, and recognized Farley's name on an attendance sheet, for a MADD victim impact panel held on July 2, 2009. At this point, a sidebar was conducted during which the prosecutor expressed his intention to ask Graham whether she was familiar with the accounts given by the three speakers at the victim impact panel, and, if she answered yes, his intention to ask her about the content of those accounts. Farley's counsel posed a hearsay objection. The trial court stated the testimony would not be hearsay because it was not going to be offered for the truth of the matter asserted but to determine whether Farley had "a subjective actual awareness of the risks of driving while under the influence."

Thereafter, Graham testified, in summary fashion, about what each of the three speakers said at the MADD victim impact panel on July 2, 2009. The three speakers were Desiree Garcia, Richard Nelson, and Suzanne Short. Graham testified: "Desiree Garcia spoke about losing her mother while Desiree was . . . 20 years old or right in there, and she talked about when the police came and told her and how that affected her. It tore her apart. [¶] She was an only child and her mother and her had been together their whole lives and now to be without her and at such a young age having to plan the funeral and somehow figure out how to get on with her life . . . ."

19

As to Nelson, Graham testified: "[H]e is a sheriff and he talk[ed] about different scenes that he has come upon, and he really stresses about alternatives to driving yourself home and to finish your plan when you are going out drinking for the evening . . . know how you are getting from that place; if it is a taxi. He talk[ed] about you can hire a helicopter for less than you paid for this D.U.I., that sort of thing, so he is giving kind of the law and to please finish your plan."

Graham testified that Short, who had since passed away, talked about being made a quadriplegic on her 21st birthday, spending the rest of her life unable to care for herself, and requiring a live-in attendant to take care of her. "It was not the life she had planned she actually doesn't have a voice it is more of a real low whisper and so that's pretty [meaningful] just by itself seeing her there in the [wheel]chair seeing she is not able to speak for herself and everything that has to be done . . . ."

B. *Preliminary Issues*

The Attorney General argues that Farley failed to preserve his challenge to Graham's testimony, based on relevance and prejudice, because at trial he made only a hearsay objection. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1233, fn. 6.) We conclude otherwise. The trial court had the opportunity to consider probative value and risk of undue prejudice. When the prosecutor described the evidentiary question presented as "basically a[n Evidence Code section] 352 analysis," the trial court responded, "I understand that."

Farley argues the trial court erred by ruling on the admissibility of Graham's testimony without any information about the testimony's substance or an offer of proof. Since the prosecutor did not know how Graham would testify, an offer of proof would not have been possible, and it was incumbent upon Farley to make motions to strike testimony that turned out to have been inadmissible. Assuming the trial court erred by ruling without information about the substance of Graham's potential testimony, the error was harmless for, as we shall explain, the testimony was admissible

20

C. *Evidence Code Section 352*

"Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) Graham's testimony on what the speakers said at the MADD victim impact panel was relevant to show that Farley was aware, not only of the life-threatening risks of drinking and driving, but also of its actual consequences. (*People v. David*, *supra*, 230 Cal.App.3d at p. 1115; *People v. Murray* (1990) 225 Cal.App.3d 734, 745.) Graham's testimony showed Farley knew of at least two instances in which drunk driving had resulted in death or severe injury and he had been advised by a law enforcement officer at the MADD victim impact panel not to drive after an evening of drinking. Graham's testimony was therefore highly probative of Farley's knowledge of the hazards of driving while intoxicated.

Although Farley does not dispute such probative value, he argues it was outweighed by the "substantial danger of inflaming the jury's passions by engendering feelings of sympathy for the victims of the charged offenses and their families." In support of this argument, he relies on *People v. Diaz* (2014) 227 Cal.App.4th 362, 365-366, 368, in which the Court of Appeal reversed a second degree murder conviction on the ground that the trial court erred by permitting the jury to watch two videos the defendant had watched in prior mandatory alcohol education programs. One video was about 29 minutes in length and showed the aftermath of several car crashes in the State of Delaware, including an alcohol-related crash in which one person was killed and another was seriously injured. (*Id.* at p. 370.) The other video was about 33 minutes in length and included testimonials from a mother and a father, each of whom had a son who was killed in an alcohol-related car crash. (*Id.* at pp. 375-376.) "The videos include numerous tearful testimonials from the families of victims of alcohol-related offenses, statements from a prosecutor and a defense attorney concerning the high rates of

21

convictions for such offenses, and statements from a judge to the effect that punishment is needed and is effective for alchohol-related driving offenses." (*Id.* at p. 365.) The Court of Appeal concluded that allowing the jury to watch the videos was reversible error because they included "a large amount of extremely prejudicial material presented in a format uniquely likely to elicit precisely the type of prejudice that Evidence Code section 352 is designed to prevent." (*Id.* at p. 380.)

Here, in stark contrast, the prosecution did not present video or audio recordings of the MADD victim impact panel, but only elicited Graham's testimony about what three panel speakers said. Graham's testimony was very brief and provided just a synopsis of each speaker's talk, without the tears and emotions of the videos deemed prejudicial in *People v. Diaz*. One speaker, Nelson, talked on the uncontroversial topic of making an alternate plan for driving home after a night of drinking. Graham seems to have testified calmly and dispassionately, and the record does not suggest otherwise. The probative value of Graham's testimony was not outweighed, much less substantially outweighed, by the probability its admission would create substantial danger of undue prejudice, confusing the issues, or misleading the jury.

## IV.

### Counsel Was Not Ineffective by Failing to Object and Move to Strike Cross-examination Testimony of Dr. Thomas. Any Error in Overruling Objections to Her Cross-examination Testimony Was Harmless.

Farley argues (1) his trial counsel was ineffective for not objecting and moving to strike when Dr. Thomas testified on cross-examination that he "consciously disregards what is expected of him in the service of his own sometimes distorted rational needs" (the consciously disregards testimony) and (2) the trial court erred by overruling his objection to, and motion to strike, Dr. Thomas's testimony on cross-examination that "[t]he judgment that goes along with knowing about not drinking and driving isn't going to be the same for him as it is for others" (the judgment about drinking and driving

testimony). We conclude there was no ineffective assistance of counsel as to the consciously disregards testimony, and any error in overruling Farley's objection or denying his motion to strike the judgment about drinking and driving testimony was harmless.

A. *Penal Code Section 29*

Penal Code section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

In *People v. Coddington* (2000) 23 Cal.4th 529, 582-583,[1] the California Supreme Court explained the permissible and impermissible uses of expert testimony on mental state in a criminal trial: "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] [Penal Code s]ections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* [(or not)] of the mental states of premeditation and

---

[1] Overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13.

deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing."[2] (Fns. omitted.)

"In other words, the defendant cannot put on an expert to testify that, because of his mental disorder or condition . . . , he or she did not have the ability, or capacity, to form or harbor whatever mental state is a required element of the charged offense, such as intent to kill, or malice aforethought, or premeditation, or deliberation." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908.)

B. *Dr. Thomas's Cross-examination*

To place the challenged testimony in context, we quote extensively from the cross-examination of Dr. Thomas. First, as to the consciously disregards testimony, the following exchange took place (the challenged question and answer are in italics):

"Q. [(The prosecutor)] . . . [Farley] has average intelligence?

"A. [(Dr. Thomas)] He did.

"Q. He is able to learn?

"A. Yes.

"Q. So, he is aware of what society expects?

"A. He is.

"Q. *There are times that he consciously disregards that; is that right?*

"A. *Yes. He consciously disregards what is expected of him in the service of his own sometimes distorted rational needs.*

"Q. But that's also part of egocentric, you do what you want to do even though you know others expect something different, you do what you want to do?

---

[2] The Attorney General argues Penal Code section 29 only prohibits an expert from offering an opinion "on the ultimate question of whether the defendant had or did not have a particular mental state <u>at the time he acted</u>." That proposition is decidedly wrong. As explained in *People v. Coddington*, *supra*, 23 Cal.4th at pages 582-583, section 29 also prohibits an expert from testifying on the issue whether the defendant had *the capacity* to form a particular mental state.

"A.  That's part of it.

"Q.  So, he does have an awareness of what he is supposed to do?

"A.  He knows, yes."  (Italics added.)

Next, as to the judgment about drinking and driving testimony, this exchange took place (the challenged question and answer are in italics):

"Q.  [(The prosecutor)] . . . *You are not saying that the psychological, psychiatric conditions that [Farley] has would force someone to drink and drive?*

"A.  *No.  Those psychological conditions that lead him to drink and drive or behave aggressively are about his understanding of himself.  He has chemical dependence.  The judgment that goes along with knowing about not drinking and driving isn't going to be the same for him as it is for others.  He is chemically dependent.*

"[Defense counsel]:  I am going to object to that last answer in its entirety and move it be stricken."  (Italics added.)

A sidebar conference was held, after which the trial court overruled the objection with the proviso:  "I think that [defense counsel] took pains not to ask the witness certain questions that might open the door or lead to an opinion as to whether or not he was capable of forming malice aforethought.  You have intentionally phrased some of your questions such as conscious disregard in a manner which seems to be consistent with the instructions.  I am suggesting to you that you be very careful here.  You want to simply ask the witness, now, you are not forming an opinion.  You are not here to state whether he has the capacity to form the intent or he did have malice aforethought that night, that's one thing, but asking . . . questions which would negate the intent seems to—or negate any potential defense might open the door for the other side, stay away from it."

## C.  *No Ineffective Assistance of Counsel as to the Consciously Disregards Testimony*

Farley contends his trial counsel was ineffective by failing to object when the prosecutor asked Dr. Thomas, "[t]here are times that he consciously disregards that; is

that right?" and by failing to move to strike her answer. To prevail on a claim of ineffective assistance of counsel, the defendant must prove (1) his or her attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) his or her attorney's deficient representation subjected him or her to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cain* (1995) 10 Cal.4th 1, 28.) Neither prong is met here.

Under Penal Code section 29, it would have been improper for the prosecutor to ask Dr. Thomas whether Farley had the capacity to form the mental state of conscious disregard for life because it is the mental state necessary for implied malice murder. (*People v. Taylor*, *supra*, 32 Cal.4th at p. 867.) But the prosecutor did not ask that question; rather, the prosecutor asked whether there were times when Farley consciously disregards "what society expects." During the sidebar conference, the trial court noted the prosecutor's questions about conscious disregard seemed intentionally phrased to be consistent with jury instructions. Though not warning the prosecutor his question was improper, the court advised him to be "very careful here."

Farley relies on *People v. Rangel* (1992) 11 Cal.App.4th 291, 298), in which the Court of Appeal concluded the trial court properly excluded a psychiatrist's expert testimony that "'in that state of intoxication, the person is not able to think rationally and deliberate, which means weigh consequences, think about things in logical sequences.'" *People v. Rangel* was a first degree murder case in which premeditation and deliberation was the necessary mental state. (*Id.* at p. 294.) The defense expert testified squarely on the ultimate facts that the defendant did not deliberate, premeditate, or harbor the requisite specific intent to kill. (*Id.* at pp. 298, 300.)

Here, the prosecutor did not ask Dr. Thomas, and she did not testify, about whether Farley had the capacity to form the requisite mental state of conscious disregard for human life. Farley's trial counsel did not perform deficiently because any objection likely would have been overruled and any motion to strike denied by the trial court.

26

(*People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Cudjo* (1993) 6 Cal.4th 585, 616; *People v. Price* (1991) 1 Cal.4th 324, 387.)

If deficient, counsel's performance did not result in prejudice. Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) A reasonable probability means a "probability sufficient to undermine confidence in the outcome." (*Ibid.*) Dr. Thomas's answer to the prosecutor's question was, "[Farley] consciously disregards what is expected of him in the service of his own sometimes distorted rational needs." The jury most likely understood that response to be directed to Farley's rebellious personality, which, as Dr. Thomas had already explained, he expressed in his extreme manner of dress and appearance, which made his parents angry and gave him a sense of control over his life. The jury likely did not understand Dr. Thomas's testimony to mean that Farley acted with conscious disregard for *human life*, particularly considering the jury had not yet been instructed on the elements of implied malice murder. It was therefore not reasonably probable the outcome of trial would have been different if Farley's trial counsel had objected to the prosecutor's question or moved to strike Dr. Thomas's answer.

D. *Harmless Error, If Any, as to the Judgment About Drinking and Driving Testimony*

Farley contends the trial court erred by overruling his objection to the prosecutor's question about whether "the psychological, psychiatric conditions" that Farley suffers "would force someone to drink and drive." We review the trial court's decision to admit or exclude mental state evidence under the abuse of discretion standard. (*People v. Cortes*, *supra*, 192 Cal.App.4th at p. 908.) The trial court did not err by overruling Farley's objection because the prosecutor did not ask Dr. Thomas about Farley's capacity to form the mental state of conscious disregard for human life.

If the trial court erred, the error was not prejudicial under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Cortes*, *supra*, 192

27

Cal.App.4th at p. 912 [*People v. Watson* standard applies to admission of mental state evidence].) Dr. Thomas's answer, though arguably subject to a motion to strike, helped Farley more than it hurt him. Dr. Thomas testified that "judgment that goes along with knowing about not drinking and driving isn't going to be the same for him as it is for others. He is chemically dependent." In other words, Dr. Thomas testified that Farley's psychological conditions and chemical dependency meant he did not have the same ability as others to make judgments about whether to drink and drive.

The jury most likely understood Dr. Thomas's testimony to mean that Farley lacked or had impaired ability to form the mental state of conscious disregard of life necessary for implied malice murder. The trial court understood this perfectly. It warned the prosecutor to "stay away from" questions that would "negate the intent" or "negate any potential defense" because doing so "might open the door" for Farley.

## V.

### Trial Counsel Was Not Ineffective by Conceding the Knowledge Element of Implied Malice.

During closing argument, Farley's trial counsel conceded that while Farley knew drunk driving was dangerous to life and argued he did not act with conscious disregard of life because he thought he was able to drive to the Del Taco restaurant. Farley contends his trial counsel was ineffective for making this "untenable" argument.

A. *Background*

The trial court instructed the jury on the elements of implied malice as follows: "The defendant acted with implied malice if: [¶] 1. . . . He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time . . . he acted, . . . he knew . . . his act was dangerous to human life; [¶] AND [¶] 4. . . . He deliberately acted with conscious disregard for . . . human . . . life."

In closing argument, Farley's trial counsel conceded elements 1, 2, and 3. Counsel stated: "Mr. Farley, in his defense, has never one time brought up that he thought that drinking and driving was not dangerous. It has never been contested. In his statement he admitted that he knew it." Counsel told the jury, "don't waste your time on" the first three elements of implied malice murder. Counsel instead focused on the fourth element and argued Farley did not act with conscious disregard because he had a good faith belief he was fit to drive to the Del Taco restaurant. Counsel stated: "[Farley] made a mistake. He thought he had waited long enough to where he could drive." Later, counsel argued: "[I]t had been a while since [Farley] had a drink. He had cigarettes and was arguing. So we have adrenalin, we have nicotine going in there. We have his OCD symptoms being calmed down. There is a period of time where he doesn't drive. This goes to implied malice. This goes to is he acting in conscious disregard or did the guy just make a mistake. He just made a mistake. He shouldn't have been driving, . . . but he didn't do this because he is thinking, oh, I am going to go driving this night. He made a mistake thinking he had waited a long enough time."

B. *The Record Discloses a Rational Tactical Reason for Conceding Knowledge.*

"'"[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts."'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) We reverse on direct appeal for ineffective assistance of counsel only when "the record on appeal demonstrates there could be no

29

rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442.)

The record discloses Farley's trial counsel had a rational tactical purpose for conceding Farley knew that driving under the influence was dangerous to human life. The evidence that Farley knew that driving while under the influence was dangerous to human life was so overwhelming that trial counsel would have lost credibility by arguing otherwise. (See *People v. Freeman* (1994) 8 Cal.4th 450, 498 ["Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt."].) By conceding an unwinnable point, Farley's trial counsel could gain credibility with the jury in trying to convince it that Farley did not act with conscious disregard of life.

Farley argues that by conceding knowledge, his trial counsel doomed that argument because, "[i]n the circumstances of this case, [Farley] could not 'know' that his act was dangerous to human life and 'deliberately act' without also having 'conscious disregard for human life.'" Both the knowledge element and the conscious disregard element of implied malice are subjective. (*People v. Knoller*, *supra*, 41 Cal.4th at p. 157; *People v. Taylor*, *supra*, 32 Cal.4th at p. 867.) A defendant might know that driving while intoxicated was dangerous to life but also entertain the belief that his or her actions are not in conscious disregard for human life. Here, for example, trial counsel argued that Farley believed in good faith, albeit mistakenly, that he was fit to drive to the Del Taco restaurant.

In addition, a major, if not the primary, defense argued by Farley's trial counsel was that Farley did not cause the collision. He presented an expert traffic accident investigator and reconstructionist, and his trial counsel presented various calculations to show, and argued extensively, that Farley did not turn left against a red light and had the right-of-way upon entering the intersection. Conceding the knowledge element of implied malice fully preserved the defense that Farley had a green turn arrow,

made a lawful left turn into the intersection, and therefore did not act with conscious disregard for life.

## VI.

### There Was No Cumulative Error.

We have identified two possible errors. The first is allowing evidence of the 2005 road rage incident. We concluded the jury instruction rendered harmless any error. The second is overruling Farley's objection to the prosecutor's question whether "the psychological, psychiatric conditions" that Farley suffers "would force someone to drink and drive." We concluded any error was harmless because Dr. Thomas's answer helped Farley more than it hurt him. As there was no reasonable probability the jury would have reached a result more favorable to Farley absent a combination of the two possible errors, there was no cumulative error. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 361.)

## VII.

### Sentence on the Enhancement to Count 1 Is Vacated.

It appears that the trial court ordered that, as to count 1, the enhancement alleged under Penal Code section 12022.7, subdivision (a) is to be stayed. The abstract of judgment reflects that action. Stay of sentence necessarily implies imposition of sentence, yet, as Farley asserts, the section 12022.7, subdivision (a) enhancement was not alleged as to count 1. The Attorney General agrees. In the disposition, we will direct the trial court to vacate imposition of sentence on the section 12022.7, subdivision (a) enhancement as to count 1 and to prepare an amended abstract of judgment.

## VIII.

### Credits Were Stated Correctly in the Abstracts of Judgment.

Farley asserts the abstract of judgment for counts 2 and 3 is incomplete because it does not reflect any credits. Two abstracts of judgment were prepared and entered: One was an indeterminate abstract of judgment for count 1, and the other was a

31

determinate abstract of judgment for counts 2 and 3.  The indeterminate abstract of judgment reflects total credits of 902 days.

Penal Code section 2900.5, subdivision (b) provides:  "For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted.  Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."  Sentence under count 2 was consecutive to that of count 1; sentence under count 3 was stayed.  Thus, credits were correctly stated on the indeterminate abstract of judgment for count 1.

## DISPOSITION

The sentence on the enhancement alleged under Penal Code section 12022.7, subdivision (a) as to count 1 is vacated.  As so modified, and in all other respects, the judgment is affirmed.  The trial court is directed to prepare an amended indeterminate abstract of judgment on count 1 and to transmit a certified copy of the abstract of the judgment as amended to the Department of Corrections and Rehabilitation.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

32