Filed 3/5/21  P. v. Palaminos CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ANTONIO PRECIADO PALAMINOS,<br><br>      Defendant and Appellant. | F080169<br><br>(Super. Ct. No. MCR025574)<br><br>**OPINION** |

### <u>THE COURT</u>[*]

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Detjen, Acting P.J., Peña, J. and Smith, J.

Appointed counsel for defendant Antonio Preciado Palaminos asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. Defendant responded, contending, among other things, (1) the trial court applied the wrong standard in determining whether defendant's Penal Code section 1170.95[1] petition for resentencing had made a prima facie showing, (2) defendant's petition counsel provided ineffective assistance by informing the trial court that defendant was not eligible for relief under section 1170.95 because he had been convicted of "second degree *Watson* murder and was not an accomplice," and (3) defendant had a right to be present at the hearing on his section 1170.95 petition. Finding no arguable error that would result in a disposition more favorable to defendant, we affirm.

## PROCEDURAL SUMMARY

On January 22, 2007, defendant was charged with five counts of murder (§ 187, subd. (a); counts 1–5), five counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); counts 6–10), hit and run (Veh. Code, § 20001, subd. (a); count 11), two counts of vehicle theft (Veh. Code, § 10851, subd. (a); counts 12–13), attempted vehicle theft (§ 664; Veh. Code, § 10851, subd. (a); count 14), grand theft (§ 487, subd. (a); count 15), and driving without a license (Veh. Code, § 12500, subd. (a); count 16). As to the five vehicular manslaughter counts, the information also alleged defendant had fled the scene (Veh. Code, § 20001, subd. (c)). (See *People v. Palaminos* (April 30, 2009, F054625) [nonpub. opn.] at p. 2 (*Palaminos*).[2]

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] We take judicial notice of the record and our prior opinion in *Palaminos*, *supra*, F054625.

2.

Following a court trial, the court found defendant guilty of all charges and found the enhancement allegations true. The court sentenced defendant to 75 years to life (five consecutive terms of 15 years to life) on the murder counts (counts 1–5), plus a determinate term of four years on the theft and hit-and-run counts. The court stayed five 6-year terms for the vehicular manslaughter counts and five 5-year enhancements for fleeing the scene. (See *Palaminos*, *supra*, F054625, at p. 2.)

In 2009, we affirmed, finding, for one thing, sufficient evidence of implied malice to support defendant's second degree murder convictions on counts 1 through 5. (See *Palaminos*, *supra*, F054625, at pp. 13–14.)

Nearly 10 years later, on January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) went into effect. It amended sections 188 and 189, narrowed the scope of culpability for murder, and added section 1170.95. (See Stats. 2018, ch. 1015, §§ 1–4.)

On June 24, 2019, defendant filed a petition for resentencing pursuant to the newly enacted section 1170.95.

On September 26, 2019, the trial court summarily denied the petition because it concluded defendant was the actual killer.

On October 11, 2019, defendant filed a notice of appeal.

## FACTS

"On July 3, 2006, 36-year-old Celia Berber and her family were visiting Celia's mother in Modesto. They left Modesto in their Toyota at about noon and headed for home in Lindsay. Celia was driving and her husband, Balentin Llerenas, sat in the front passenger seat. Their three children, sixteen-year-old Sulema Alvarez, 10-year-old Andoney Llerenas and four-year-old Brian Llerenas, were in the back seat.

"A., an equipment driver with a special license to pull heavy equipment, decided to stop by his father's house on Road 29. A. was driving a Chevy heavy-duty pickup truck pulling a bulldozer on a trailer (together, the rig). A. was the only person who drove the truck, and he had attached the trailer and bulldozer himself. The trailer was a 'fifth wheel' or

3.

gooseneck trailer that sat over the truck's rear axle. The bulldozer was tied down to the trailer with binders and chains in both front and back, as required by law. When the truck was pulling weight, it was harder to stop, but the brakes on the truck and the trailer were regularly maintained and serviced. That day, A. had set the truck's brake controller to 7.5 out of 10 to accommodate the load he was pulling and the brakes were working well with the load.

"Shortly before A. arrived at his father's house, his relative, B., was outside the house. B. noticed a man across the street, about 45 feet away, looking into the neighbor's car. The man was thin and in his twenties. He was wearing a dark shirt and pants and was carrying some type of black bag. B. paid little attention because she thought the man was one of the neighbor's friends. She went back inside the house. Later, the neighbor's car was found in disarray.

"When A. arrived at his father's house, he parked the rig on the side of Road 29. He left the keys in the ashtray and the doors unlocked. He went in to check on his father and returned in 10 minutes to find the rig gone. He had not given anyone permission to take it. He looked down the road and saw the rig in the distance.

"C., a contractor in heavy equipment, was driving a full-sized pickup truck on Road 29 when he saw the rig about one-half mile away and approaching in the wrong lane. The rig rode on the shoulder of the wrong lane, crossed back to the other side of the road, and then almost ran off the shoulder on that side. The trailer was 'sliding.' Dust from the shoulder flew up from the back of the truck and the trailer. The rig then traveled in the proper lane as it approached C.'s truck. C. had slowed to about 25 miles per hour as he watched the rig. The rig again drifted completely into the wrong lane, traveling at a 'pretty fast pace,' and the vehicles were about one hundred yards apart. C. took evasive action, driving his truck entirely off the road and onto the shoulder. If he had not done so, the rig would have hit him head-on. As he drove off the road, C. thought the truck was going to hit his door panel directly, but then the truck drifted back into its lane, and C. thought the trailer and bulldozer would sideswipe his truck. C. looked directly at defendant because C. wondered if he knew the driver and if the driver even saw him there. Defendant's eyes were open wide and he 'looked like he was absolutely scared to death.' The trailer did not swerve, but it missed C.'s truck by about 12 inches. C. was grateful he had not been killed. C. continued to watch the rig as it passed and he saw no brake lights. He also heard no sound of the trailer braking, a distinctive

sound with which he was very familiar. He watched the rig in his rearview mirror until it went over a hill and out of sight.

"D., a painting contractor, was painting the interior of a building on Road 29. At about 1:00 p.m., he went out to his van to start cleaning up. As he stood in the parking lot, he noticed the rig traveling at a 'pretty good rate of speed' on Road 29. He was concerned because he knew there was a stop sign up ahead at Avenue 12. After the rig went by, D. heard brakes lock up, followed by a crash. He looked up from his van and saw a car in flames. D. called 911 and drove toward the crash.

"Defendant had driven through the stop sign. The truck collided with the Toyota carrying Celia and her family and pushed it into the bridge rail. As the truck ran into the bridge rail, the trailer jackknifed and hit the car a second time. The car caught fire.

"E. was driving on Avenue 12, preparing to turn, when he suddenly saw the rig pushing the Toyota up against the rail. E. parked in front of D.'s van and got out. He saw defendant running away from the scene and in his direction. Defendant looked anxious and scared. E. told him he should go back to the accident. Defendant got angry and asked E. who he was and why he (defendant) had to answer to him. Defendant took off his shirt and cleaned some blood off his arms and shoulders. He said something nonsensical about his sister being there and he continued past E.

"E. ran to the scene and saw Celia on the ground beside the Toyota, which was in flames. E. and two other men pulled her away from the car. E. saw four burning figures still inside. Celia asked for water and someone poured water on her face. Celia told them her name, and the name and telephone number of her mother.

"D. saw defendant flag down a pickup truck with his shirt. Defendant got in the truck and it drove away.

"When F., a paramedic, arrived, the Toyota was still on fire and Celia was on the pavement. Celia was completely alert and oriented. She was aware of what was going on. She had a broken ankle and arm, and about 70 or 75 percent of her body had second and third degree burns. She told F. that 'some bastard had hit her with the … white truck and that he took off running and that the car caught on fire and everybody was still inside.' She said the truck had cut in front of her. She told F. her name and told her to go help her children and husband. She said she could not believe what was happening; she was aware that her husband and children were still in the burning car. She kept telling F. not to help her, but to go

5.

help her children.  She told F. she wanted to die.  F. transported Celia to University Medical Center in Fresno.

"Celia's husband and three children, who had incurred various injuries in the collision, burned to death in the car.  Later, Celia also died from her burns.

"An officer arrived to find the Toyota crushed against the rail and burned.  Four burned figures remained inside.  Celia had been taken to the hospital.  A black T-shirt was hanging on the gooseneck portion of the trailer.  In the debris field around the truck, the officer found a black CD case and various papers in the name of the neighbor who lived on Road 29.  The papers included the neighbor's car registration.

"The accident investigation team determined that the truck hit the Toyota and pushed it sideways in the direction the truck was traveling and into the bridge rail.  The truck was rated to carry 22,000 pounds and it was 8,467 pounds overweight at the time.  This had a detrimental effect on its braking ability, as though the rig had been going 10 miles per hour faster than it was, but there was still ample distance (751 feet) for the rig to stop between the stop ahead sign and the stop sign.  The approach to the sign was inclined and slightly curved.  If defendant had merely taken his foot off the throttle at that point, the rig would likely have come to a stop at the sign.

"The speed limit on Road 29 was 55 miles per hour.  Two digital security cameras on a nearby business allowed officers to calculate defendant's speed on Road 29 as between 61 and 65 miles per hour.

"The sensing and diagnostic module in the truck revealed that about five seconds before the air bags were deployed, the truck was going 61 miles per hour and the brakes were not in use.  About three seconds before deployment, the truck was going 52 miles per hour and the brakes were activated.  About two seconds before deployment, the truck was going 44 miles per hour and the brakes were still activated.  Thus, defendant had attempted to stop the truck.

"At about 6:20 p.m. on the same day, an officer was dispatched to Mearl's Market.  A male had reported being assaulted, but had hung up on the dispatcher without giving his name or any other information.  When the officer entered the market, he could locate no victim and the clerk was aware of none.  The officer exited and saw a blue Chevy van parked nearby.  Defendant was sitting in the driver's seat.  The officer asked him if he knew of any assault victims in the vicinity.  Defendant said he had seen

6.

the victims walking down a particular street.  The officer searched for the victims, then returned to the blue van where defendant was still sitting.  Defendant was looking around inside the van.  He was sweating and appeared nervous.  He smelled strongly of alcohol, which was consistent with having consumed alcohol within the last hour or two.  Defendant never told the officer he had been attacked, that he was running from anyone or that he was scared.  The officer noticed some wires hanging underneath the steering column area and he thought defendant was trying to hot-wire the van.

"The officer recalled being briefed on a hit-and-run accident earlier in the day.  The suspect had tattoos, scratches on his arms and was wearing Adidas shoes.  The officer observed tattoos on defendant and asked him to lift up his sleeve.  Defendant had long scratches on his left arm.  When defendant removed his shirt, the officer saw a bruise on his neck and left chest area, which the officer recognized as the type sustained when wearing a seat belt during a vehicle collision.  Defendant was wearing Adidas shoes.  The officer arrested defendant, but did not inform him he was suspected of being involved in an accident in which people had died.

"F., the paramedic, was dispatched to Mearl's Market regarding an assault.  When she arrived, two or more officers were present.  F. administered medical aid to defendant, who claimed he had been beaten up by three men.  He had multiple abrasions and bruising to his arms and chest.  He had an abrasion to the left clavicle that was consistent with a seat belt mark and an automobile accident.  Defendant was very rude.  He made several remarks, even though no one was speaking to him.  He said he did not understand why he was under arrest because he had not killed anyone and had not done anything.  Defendant was slurring his speech, he smelled of alcohol and his eyes were red and glossy.  F. asked him if he had been drinking or taking drugs, and he said he had not.  Defendant was transported to the hospital by ambulance.

"An officer also observed that defendant smelled of alcohol and was unsteady on his feet.  The officer believed defendant was under the influence of alcohol.

"An officer rode along in the ambulance.  Defendant was smiling and appeared to be under the influence of alcohol.  The officer saw no sign that defendant was under the influence of a stimulant or a narcotic.  When defendant was informed at the hospital about the death of the three children and their father, he smiled and laughed.

"A nurse in the emergency room spoke Spanish and was able to translate for the other nurses and the officers. When the nurse spoke to defendant, he told her that 'he had four tall beers, the 40 ounces, and that he had used meth that morning.'

"On cross-examination, the nurse explained more specifically that she asked defendant '[D]o you drink today[?]' and 'Do you use drugs[?]' Defendant said he drank four tall beers—his actual words were ' "Cuatro cervezas de la botella grande" '—and used methamphetamine. The nurse could not recall if she had asked him when he drank the beers. She did ask him when he used methamphetamine and he said he had used it that morning.

"A nurse's note in the medical records stated that defendant 'admit[ted] to drinking and methamphetamine use today[.] $20 bag of meth ingested by smoking and 4 tall beers[.]'

"Defendant's blood was drawn at 9:17 p.m. It contained 0.14 percent alcohol and 100 nanograms methamphetamine per milliliter.

"A criminalist testified as an expert on the effects of alcohol. The prosecutor presented the expert with a hypothetical question regarding a 150-pound male who started drinking at approximately 4:00 a.m. and finished drinking at approximately 11:00 a.m., consumed four 40-ounce malt liquors at six percent alcohol, and had a 0.14 percent blood-alcohol level at 9:17 p.m. The prosecutor asked the expert for his opinion regarding the male's blood-alcohol percentage at 1:00 p.m. The expert worked back from the 9:17 p.m. percentage and opined that the percentage at 1:00 p.m. would have been between 0.14 and 0.31. The prosecutor then asked the expert to consider the same question, but without considering the 9:17 p.m. percentage. The expert worked forward from the alcohol consumed and answered that the percentage at 1:00 p.m. would have been 0.18. The prosecutor asked the expert variations on these hypothetical questions.

"A toxicologist testified that defendant's blood would have contained about 200 nanograms per milliliter at about 1:00 p.m. The toxicologist testified that methamphetamine can impair a person's ability to drive, but the toxicologist could not form an opinion regarding whether defendant was impaired at the time he was driving because the toxicologist did not know when defendant ingested the methamphetamine, how much he ingested, how often he ingested it or any facts regarding his physical or mental performance that day. The toxicologist explained that the effect of methamphetamine in general is 'to rev your body up for action [like] the

8.

fight or flight reaction ….' It can make a person more alert and can counteract some of the effects of a central nervous depressant, such as alcohol.

"A few months before the collision, on May 11, 2006, at about 11:10 p.m., an officer stopped defendant after witnessing him back a van into the wrong lane of traffic. The officer observed that defendant had a strong odor of alcohol, slurred speech and red, watery eyes. Furthermore, defendant did not have a license. He said he had consumed two beers at about 6:30 that evening. The officer arrested defendant for driving under the influence and took him to jail.

"***Defense Evidence***

"Defendant testified that on July 3, 2006, he drank three 16-ounce King Cobra beers between about 8:00 and 9:00 a.m. He explained he was carrying a black CD case when he realized he was being followed by four gang members. He ran to the truck and drove away to save his life. He tried to brake before he got to the curve ahead of the stop sign, but the brakes did not work.

"After the collision, he ran to where he saw a friend, who drove him to a store and gave him ten dollars to buy beer. He bought two 40-ounce King Cobra beers and began to drink them. He saw the four gang members again and called the police to report that he was being beat up. He hid inside the van so the men would not find him. He tried to start the van so he could flee if necessary.

"On cross-examination, defendant admitted not having a driver's license. He did not remember telling officers that he did stupid things when he was drunk.

"***Rebuttal Evidence***

"An officer testified that when he interviewed defendant after his arrest, defendant first claimed that a friend named Jose had been driving the truck. Then defendant admitted crashing the truck. He admitted he was drunk at the time of the crash and he said he did stupid things when he was drunk. He said he drank four 16-ounce beers the morning of the collision. He said he got in the truck and adjusted the radio to his favorite station. Prior to the collision, he was traveling approximately 65 miles per hour. He did not mention being chased by anyone. He said he braked late going into the curve. After the collision, he was afraid of the fire and feared the

truck would explode." (*Palaminos*, *supra*, F054625, at pp. 2–10, fns. omitted.)

## **DISCUSSION**

The essence of defendant's numerous arguments is that the trial court erred when it denied his section 1170.95 petition. He claims he is eligible for relief under the statute because he was convicted under a natural and probable consequences theory that is no longer viable after Senate Bill 1437. We disagree, and conclude defendant was ineligible as a matter of law.

### I. Implied Malice Second Degree Murder

In our 2009 opinion in this case, we explained: " 'Murder is the unlawful killing of a human being … with malice aforethought.' [Citation.] 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] Stated another way, '[m]alice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.' (*People v. Knoller* (2007) 41 Cal.4th 139, 143; see also *People v. Taylor* (2004) 32 Cal.4th 863, 868.) This is a subjective standard: the defendant must have *actually appreciated* the risk involved. (*People v. Watson* (1981) 30 Cal.3d 290, 297.) [¶] We conclude there was … sufficient evidence on the record at the end of the prosecution's case to support the finding of implied malice. Ample evidence established defendant was put on notice that his driving was dangerous to the lives of those around him and he continued to drive despite his awareness of the risk he posed. He drank alcohol and ingested methamphetamine that morning. He

10.

previously had been arrested for driving under the influence. He drove a stolen truck attached to a piece of heavy equipment, the handling and braking of which would naturally be different than an ordinary vehicle. He not only had no special license to operate the vehicle, he had no driver's license at all. He was in fact unable to control the rig, to the point that he could not keep it in the correct lane or even on the road. He nearly collided head-on with an oncoming driver, who had to take evasive action to prevent a potentially fatal collision. Defendant's fearful expression as he drove indicated he was aware of his inability to drive the rig safely. But, instead of slowing down or stopping the rig, he proceeded at a high speed, knowing he was unable to control the rig. He finally attempted to brake, but it was too late. He ran the stop sign and killed an entire family. We have no reservations regarding the quantum of evidence supporting the five murder convictions in this case." (*Palaminos*, *supra*, F054625, at pp. 13–14.)

## II.    Senate Bill 1437

In 2018, the Legislature enacted Senate Bill 1437 after determining there was further "need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § l, subd. (b).) Senate Bill 1437 changed murder liability under two theories—(1) the felony-murder rule and (2) the natural and probable consequences doctrine—through two statutory amendments.

First, "[u]nder the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–248.) Senate Bill 1437 amended section 189 to provide that a defendant who was not the actual killer and did not have an intent to kill would not be liable for felony murder unless he was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e), added by Stats. 2018, ch. 1015, § 3.) Specifically, under the new law, "[a] participant in the perpetration or attempted perpetration of a felony … in which

11.

a death occurs is liable for murder only if … :  [¶] (1) [t]he person was the actual killer[,] [¶] (2) [t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree[, or] [¶] (3) [t]he person was a major participant in the underlying felony and acted with reckless indifference to human life ….” (*Ibid*.)

Second, before Senate Bill 1437, “malice could be imputed to an aider and abettor under the natural and probable consequences doctrine.” (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1002 (*Roldan*).)  “When an accomplice aid[ed] and abet[ted] a crime, the accomplice [was] culpable for both that crime and any other offense committed that [was] the natural and probable consequence of the aided and abetted crime.  Natural and probable consequences liability [could] be imposed even if the accomplice did not intend the additional offense.” (*People v. Gentile* (2020) 10 Cal.5th 830, 838 (*Gentile*).)  Thus, “an aider and abettor who lacked express malice but merely engaged in activity of which murder was a natural and probable consequence could have implied malice imputed to him or her, and could therefore be convicted of second degree murder.” (*Roldan*, at p. 1002.)  “[T]he natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense.” (*People v. Lamoureux*, *supra*, 42 Cal.App.5th at p. 248.)  “[T]o amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) … :  ‘Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.’ ” (*Gentile*, at pp. 842–843; § 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.)

Senate Bill 1437 also added section 1170.95 to provide a postjudgment procedure by which a defendant "convicted of felony murder or murder under a natural and probable consequences theory" may petition the trial court to have the "murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a), added by Stats. 2018, ch. 1015, § 4.)

Once a section 1170.95 petition is filed, there follows a multi-step process by which the trial court first determines whether the petition is facially complete. "[T]he person must file a petition with the trial court that sentenced the petitioner declaring, among other things, that the petitioner 'could not be convicted of first or second degree murder because of changes to Section 188 or 189.' (§ 1170.95, subd. (a)(3); see § 1170.95, subd. (b)(1)(A).) Then, the trial court must 'review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of th[e] section.' (§ 1170.95, subd. (c).)" (*Gentile*, *supra*, 10 Cal.5th at p. 853.) To do so, the court must determine whether "(1) [a] complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[,] [¶] (2) [t]he petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[, and] [¶] (3) [t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a); *id*., subd. (c).) If the court determines at this stage the petitioner is ineligible for relief as a matter of law, the petition is denied; if not, the court proceeds to the next step, in which "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The

prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' " (*Gentile*, at p. 853.)

### III. Analysis

Here, defendant claims that "the [natural and probable consequences] theory for the act necessary for implied malice no longer exists due to the changes to … section 188 brought about by [Senate Bill] 1437." He explains that "section 188 changed the [natural and probable consequences] theory of implied malice murder and the [natural and probable consequences] doctrine of aiding and abetting in that it no longer allows for malice to be imputed to an accused based solely upon their participation in a criminal act. The changes to … section 188 did **not** eliminate implied malice, it only eliminates implied malice based solely upon a criminal act. Malice may still be implied, as long as there is sufficient evidence of it, aside from the underlying criminal act. [S]ection 188 now restricts an implied malice theory of murder to specifically exclude imputed malice solely from a criminal act. The changes to … section 188 were designed to ameliorate implied malice second degree murder convictions, such as [defendant's], whereby one was convicted of murder due solely to having committed a criminal act. In [defendant's] case, he was convicted of murder based upon implied malice imputed to him from the criminal act of driving while intoxicated. The Legislature's intent in enacting [Senate Bill] 1437 was to, in-effect, re-align an offender's punishment when convicted of murder in these limited situations where malice has been imputed from a criminal act, to be more in line with their culpability. In [defendant's] case, he should now be resentenced on his murder convictions to vehicular manslaughter …."

Second degree murder based on implied malice was not eliminated by Senate Bill 1437, which "removed the natural and probable consequences doctrine as a basis for a murder conviction only insofar as it applied to aider and abettor liability." (*Roldan*, *supra*, 56 Cal.App.5th at p. 1004.) The natural and probable consequences doctrine of aiding and abetting and the definition of implied malice are sometimes confused because

14.

both contain similar language regarding a "natural consequence," but they are "distinctly different concepts." (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1056–1057 (*Soto*), review granted Sept. 23, 2020, S263939.)

"Implied malice is a mental state for the commission of the crime of second degree murder, either by the principal or as an aider and abettor … to murder. This distinction between direct aiding and abetting liability and natural and probable consequences doctrine is critical because potential relief under section 1170.95 extends only to those convicted of murder by operation of the natural and probable consequence doctrine or of felony murder. (See § 1170.95, subd. (a) ['A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder convicted vacated.'].) Senate Bill No. 1437 changed the circumstances under which a person could be convicted of murder without a showing of malice, but it did *not* exclude from liability persons convicted of murder for acting with implied malice." (*Soto*, *supra*, 51 Cal.App.5th at pp. 1056–1057, italics added, fn. omitted.) This theory of murder survived the enactment of Senate Bill 1437.

"For implied malice murder, [the requisite] intent is that the perpetrator ' "knows that his conduct endangers the life of another and … acts with conscious disregard for life." ' [Citation.] The 'physical component' required for implied malice murder 'is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." ' [Citation.] [¶] The natural and probable consequence doctrine, by contrast, is a theory of liability by which an aider and abettor who intends to aid a less serious crime can be convicted of a greater crime. This doctrine comes into play when 'an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense).' [Citation.] Applying the natural and probable consequences doctrine, 'a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime),

15.

but also for any other crime that is the "natural and probable consequence" of the target crime.' [Citation.] Unlike aiding and abetting implied malice murder, which requires the aider and abettor to (at least) share the mental state of the actual perpetrator of implied malice murder, ' "aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense [e.g., murder] because the nontarget offense was not intended at all." ' " (*Soto*, *supra*, 51 Cal.App.5th at p. 1058.)

The trial court in this case did not err in denying defendant's section 1170.95 petition for resentencing. The court correctly found, as a matter of law, that defendant was ineligible for relief. As our prior opinion demonstrates, defendant was the sole perpetrator and he was not charged or convicted of felony murder or murder under the natural and probable consequences doctrine directed at accomplice liability. (See § 1170.95, subd. (a)(1), (2); *People v. Tarkington* (2020) 49 Cal.App.5th 892, 899, review granted Aug. 12, 2020, S263219 [the defendant was ineligible as a matter of law where the jury was not instructed on natural and probable consequences doctrine or felony-murder rule]; *People v. Edwards* (2020) 48 Cal.App.5th 666, 674, review granted July 8, 2020, S262481 [the defendant "*could not* meet the statutory prerequisites for even filing a section 1170.95 petition because he was not charged or convicted of second degree felony murder or murder under the natural or probable consequences doctrine directed at accomplice liability"]; *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1157 [the defendant did not make the requisite prima facie showing that he was convicted of murder under a natural and probable consequences theory].) The record demonstrated the victims died as the result of the injuries and burns sustained when defendant drove the rig while impaired by alcohol. Defendant was not alleged to have aided and abetted another and was not convicted under either a felony murder or a natural and probable consequences theory. He alone caused the fatal collision that killed an entire family and section 1170.95 provides him no relief. Further, defendant's claims that the trial court

relied on disputed facts and applied the incorrect standard to consideration of his petition are unmeritorious.

Petition counsel's concession at the hearing that defendant was the actual killer and therefore ineligible was appropriate and correct.[3]  Further, even if error, it was harmless because defendant was ineligible as a matter of law and the concession made no difference.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Similarly, defendant's absence from the hearing, if error, was harmless because defendant was ineligible as a matter of law and his presence would have made no difference.  (See *Chapman v. California*, at p. 24; *People v. Watson*, at p. 836.)

In sum, we have reviewed the record and find no arguable issues on appeal.

### DISPOSITION

We take judicial notice of the record and our prior opinion in *Palaminos*, *supra*, F054625.  The order denying defendant's section 1170.95 petition for resentencing is affirmed.

---

[3]    Petition counsel had also been defense counsel at trial.